Nilda TORRES NIEVES,
et al., Plaintiffs,

v.

HOSPITAL METROPOLITANO,
et al., Defendants,

v.

Dr. Dimas FERRER, Third
Party Defendant.

No. Civ. 93–2037(SEC).

United States District Court,
D. Puerto Rico.

March 26, 1998.

Benny F. Cerezo, Río Piedras, PR, for Plaintiffs.

Juan M. Masini–Soler, San Juan, PR, for Defendants.

Juan R. González–Muñoz, San Juan, PR, for third party Defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Pending before the Court is the Motion to Dismiss or for Summary Judgment filed by third party defendant Dr. Dimas Ferrer ("Dr.Ferrer") (**Docket # 117**).[1] Defendant Hospital Metropolitano ("HM") joined Dr. Dimas Ferrer's Motion to Dismiss or for Summary Judgment (**Docket # 120**). HM joined Dr. Ferrer's motion on the basis that its third party action against Dr. Ferrer is solely a contingent indemnity action, insofar as any liability faced by HM is based primarily on the actions undertaken by Dr. Ferrer in its treatment of plaintiff Nilda Torres Nieves ("plaintiff") while she was at HM. Consequently, both HM and Dr. Ferrer seek judgment as a matter of law, claiming that under the undisputed facts presented neither HM nor Dr. Ferrer are liable to plaintiffs under the Emergency Medical Treatment and Active Labor Act ("EMTALA") or Puerto Rico medical malpractice doctrine. Plaintiffs opposed the Motions for Summary Judgment (**Docket # 127**), claiming that there are genuine issues of material fact that preclude the granting of summary judgment on both the EMTALA and the medical malpractice claims.

For the reasons stated below in this Opinion and Order, defendants Dr. Ferrer and Hospital Metropolitano's Motions for Summary Judgment (**Dockets # 117, 120**) are **GRANTED.**

### Factual Background .

On January 15, 1995 at around 10:30 p.m. plaintiff Nilda Torres Nieves was taken by her daughter to the emergency room at Hospital Metropolitano, suffering from abdominal pain, vomiting, and nausea. Third Party defendant Dr. Ferrer was on duty in the emergency room at HM that night. In order

1. It is clearly established that if a court considers matters outside the pleadings in deciding a motion to dismiss pursuant to Rule 12(b), the court must treat the motion as one for summary judgment. *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 993 F.2d 269, 272 (1st Cir.1993), *cert. denied* 514 U.S. 1082, 115 S.Ct. 1792, 131 L.Ed.2d 720 (1995). In the present case, we will rely on documentation beyond the pleadings to solve the pending dispositive motions and thus we will treat defendants' motions to dismiss or for summary judgment as motions for summary judgment. Both plaintiffs and defendants presented documentation to bolster their respective positions and appeared to treat the pending motions as motions for summary judgment, the title of the motion as either to dismiss or for summary judgment notwithstanding.

to determine plaintiff's medical condition, Dr. Ferrer ordered a battery of tests that included laboratory tests, x-rays, and a physical examination. Dr. Ferrer determined an initial working diagnosis of gastroenteritis and prescribed some medications designed to relieve some of the pain being suffered by plaintiff, control her vomiting, and to prevent dehydration.

Once the results of the laboratory tests and x-rays were in, Dr. Ferrer reached a potential diagnosis of appendicitis acute and cholecystitis. At all times during her stay at HM plaintiff's condition was stable; she was alert and coherent and her condition did not deteriorate. Because plaintiff did not have medical insurance or the means to cover the costs of the treatment required, Dr. Ferrer made the necessary arrangements for plaintiff to be transferred to the Puerto Rico Medical Center ("PRMC"). She was then transferred to the PRMC, where she arrived at approximately 2:00 a.m., having at all times been in a stable condition.

Once at the PRMC, Dr. Ferrer's R/O diagnosis of appendicitis acute was confirmed by the PRMC's emergency room personnel. At the PRMC, plaintiff was apparently afforded no treatment until an appendectomy was performed by surgeons at around 6:00 p.m. on January 16, 1992. It is at this point where plaintiff's medical emergency began taking a nefarious turn.

After the operation, plaintiff was not able to defecate and was suffering from great pain. Because of this, doctors at the PRMC performed a sonogram and a CT–Scan on plaintiff which revealed that the urethra from the right kidney had been lacerated and that there were disperse liquids inside. Plaintiff was referred to the Urology Department at PRMC where a drainage was ordered but not performed until several days after the order was issued. During a subsequent operation, plaintiffs ureter was joined. After that operation, a CT–Scan revealed that during plaintiffs appendectomy the right ureter was nicked. As a result, plaintiff underwent

a final operation in which her right kidney was removed.

Plaintiffs argue that HM violated the provisions of EMTALA by: (1) failing to provide Nilda Torres Nieves with an adequate medical screening examination and by (2) transferring Nilda Torres Nieves because she could not afford to pay, without first stabilizing her condition. Invoking this Court's diversity jurisdiction, plaintiffs also argue that HM is liable for medical malpractice for the care that plaintiff received while she was at HM. Dr. Ferrer was originally a defendant in this lawsuit, but plaintiffs voluntarily dismissed both their EMTALA and medical malpractice claims against him. HM then filed a third party complaint against Dr. Ferrer, in the nature of a contingent indemnity action, for Dr. Ferrer to respond to HM for any damages that they might be subject to.[2]

**Summary Judgment Standard**

As noted by the First Circuit Court of Appeals,

> [s]ummary judgment has a special niche in civil litigation. Its role is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.' *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to husband scarce judicial resources.

*McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

According to Fed.R.Civ.P. 56(c), a summary judgment motion should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.

---

**2.** The PRMC was originally a defendant in this lawsuit, but plaintiffs' medical malpractice claims against the PRMC filed in federal court were dismissed based on Eleventh Amendment immunity. There is currently pending litigation against the PRMC in the Commonwealth of Puerto Rico courts.

56(c). *See also NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28 (1st Cir.1994). It is not enough to conjure up an alleged factual dispute between the parties; to defeat summary judgment, there must exist a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

As stated by the First Circuit, "a party contesting summary judgment must offer the court more than posturing and conclusory rhetoric." *McIntosh v. Antonino,* 71 F.3d 29, 33 (1st Cir.1995). Furthermore, "[t]his principle is brought into bold relief when the motion targets an issue on which the non-moving party bears the ultimate burden of proof. In that circumstance, the nonmovant must 'produce specific facts, in suitable evidentiary form,' in order to demonstrate the presence of a trialworthy issue and thereby deflect the sharp blade of the summary judgment ax." *Id., quoting Morris v. Government Development Bank of Puerto Rico,* 27 F.3d 746, 748 (1st Cir.1994).

For a dispute to be "genuine," there must be sufficient evidence to permit a reasonable trier of fact to resolve the issue in favor of the non-moving party. *United States v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir.1992). *See also Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 24 (1st Cir. 1989). By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. *Morris,* 27 F.3d at 748. Moreover, "genuineness and materiality are not infinitely elastic euphemisms that may be stretched to fit whatever pererrations catch a litigant's fancy." *Lawton v. State Mutual Life Assurance Company of America,* 101 F.3d 218, 223 (1st Cir. 1996), *quoting Blackie v. State of Maine,* 75 F.3d 716, 721 (1st Cir.1996).

In determining whether to grant summary judgment, the Court may not, however, weigh the evidence. *Casas Office Machines v. Mita Copystar America, Inc.,* 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id., citing Greenburg v. Puerto Rico Maritime Shipping Authority,* 835 F.2d 932,

936 (1st Cir.1987). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines,* 42 F.3d at 684.

### Applicable Law—EMTALA

■ The Emergency Medical Treatment and Active Labor Act (EMTALA)—or the Anti-Dumping Act, as it is otherwise commonly known—was enacted by Congress with a clear and specific purpose in mind: to allay concerns "about the increasing number of reports that hospital emergency rooms [were] refusing to accept or treat patients with emergency conditions if the patient [did] not have medical insurance." *Correa v. Hospital San Francisco,* 69 F.3d 1184, 1189 (1st Cir.1995), *citing* H.R.Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), *reprinted in* U.S.C.C.A.N. 42, 605. *See also, generally,* Barry R. Furrow, *An Overview and Analysis of the Impact of the Emergency Medical Treatment and Active Labor Act,* 16 J. Legal Med. 325 (Sept.1995); Diane S. Mackey, *The Emergency Medical Treatment and Active Labor Act: An Act Undergoing Judicial Development,* 19 U. Ark. Little Rock L.J. 465 (May 1997).

■ The Act itself did not limit its coverage to persons without economic resources for emergency care. *Mackey, supra,* at 466. *See also* Alicia K. Dowdy, et al., *The Anatomy of EMTALA: A Litigator's Guide,* 27 St. Mary's L.J. 463, 465 (1996). But neither did it "provide a private cause of action against the hospital and physician for misdiagnosis or improper treatment, areas traditionally governed by state malpractice law." *Furrow, supra. See also Correa,* 69 F.3d at 1192; *Socia–Lebron v. Ashford Presbyterian Community Hospital,* 995 F.Supp. 241 (D.P.R.1998); *Vickers v. Nash General Hospital,* 78 F.3d 139, 142 (4th Cir.1996); *Baber v. Hospital Corp. of America,* 977 F.2d 872, 879 (4th Cir.1992).

■ EMTALA provides a cause of action for injured patients against a participat-

**133**

ing hospital.[3] In order to comply with the main provisions of EMTALA, a participating hospital must: (1) conduct an appropriate medical screening of all persons who come to its emergency room seeking medical attention, and (2) must stabilize the patient before transferring her, unless transferring the patient to another facility can be accomplished with relative safety. *See Correa*, 69 F.3d at 1190.

■ The First Circuit has held that [t]o establish an EMTALA violation, a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.

*Id.*

For purposes of this motion, defendants do not contest that the first two prongs of the test for liability under EMTALA are met in this case: (1) that HM is a participating hospital under the terms of the statute, and (2) that plaintiff Nilda Torres Nieves arrived at the facility seeking treatment. The crux of the inquiry in the present case is, therefore, whether HM afforded plaintiff an adequate medical screening, and whether they transferred her without first stabilizing her emergency medical condition. To that end, we now turn to define the terms "appropriate medical screening" and "stabilization."

■ In trying to define what is an "appropriate medical screening," the First Circuit has found that "the adjectival phrase is not self-defining." *Id.* at 1192. However, "[a] hospital fulfills its statutory duty to

screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Id. See also Baber*, 977 F.2d at 879. As the Court found, "[t]he essence of this requirement is that there be some screening procedure, and that it be administered even-handedly." *Id.*

■ EMTALA defines the term "stabilized" in the following way: "with respect to an emergency medical condition, that no material deterioration of the condition is likely, within reasonable medical probability, to result from the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(B). To determine whether a patient is "stable" within the meaning of EMTALA, one must look at the patient's condition at the time of the transfer or discharge. *See, e.g., Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271 (6th Cir.1990) (evaluating patient's condition at the time of discharge).

■ While EMTALA imposes a duty to stabilize a patient, it does not impose a duty to fully cure an emergency condition before transferring or discharging a patient. The standard is clear from the statute: if no material deterioration of the patient's emergency medical condition is likely to result within reasonable medical probability as a result of the transfer, then the patient has been stabilized and no EMTALA violation has occurred. The Ninth Circuit so held in *Brooker v. Desert Hospital Corp.*, 947 F.2d 412, 415 (9th Cir.1991):

The Act [EMTALA] did not require Desert Hospital to alleviate completely Brooker's emergency condition. The Act did not require the hospital to perform angioplasty or bypass surgery within a specified time period. Rather, the Act required the hospital to provide [the patient] with appropri-

---

**3.** The section of the statute that provides a cause of action for injured patients states as follows: Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital,

obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

42 U.S.C. § 1395dd(d)(2)(A).

ate medical screening and stabilizing treatment and to refrain from transferring her unless she was 'stabilized.'

### Analysis—EMTALA claim

HM does not contest the existence of the first two elements of an EMTALA cause of action, namely, that HM is a participating hospital under the terms of the statute, and that plaintiff Nilda Torres Nieves went to HM seeking assistance for an emergency medical condition. We shall thus limit our analysis to determining whether plaintiff was provided an adequate medical screening, and to whether she was stabilized at the time of her transfer to PRMC. The Court finds that plaintiff was afforded an adequate medical screening and that she was stable at the time of her transfer to PRMC; thus, plaintiffs do not have a viable EMTALA claim against HM.[4] The Court finds that there are no genuine issues of material fact that would preclude the granting of summary judgment for HM on the EMTALA claims.

### Plaintiff was afforded an adequate medical screening by the HM staff

The Court finds that the uncontroverted evidence demonstrates that plaintiff Nilda Torres Nieves received an adequate medical screening while she was at HM. First, she was subjected to a battery of tests, including blood and urine analyses, as well as x-rays, in an effort to identify the source of her symptoms. Furthermore, her vital signs were constantly monitored and she received medications and intravenous fluids designed to alleviate her pain, control her vomiting, and prevent dehydration. During the time she spent at HM, until the decision was made to transfer her to PRMC, there is absolutely no indication that plaintiff was treated any differently than would any paying patient. By the time she was transferred to PRMC, plaintiff's vomiting had abated and Dr. Ferrer had made a R/O ("rule out") diagnosis of appendicitis acute, which turned out to be correct.

These findings are bolstered by the opinions of defendants' expert witness, Dr. Calimano, who stated that Nilda Torres Nieves was afforded an adequate medical screening while at HM. In his expert witness report, Dr. Calimano made the following findings:

> [I]t is my opinion that this patient received excellent care at Hospital Metropolitano Emergency Room. She had a focused history, physical and physician follow up that together with the appropriate laboratory and X–Ray exams led to the correct diagnosis: "Abdominal pain cause unknown; R/O Cholecystitis—Cholelithiasis; Acute Appendicitis."
>
> She received treatment to prevent dehydration, to control her nausea and to relieve her pain and was then referred to the Puerto Rico Medical Center for further care together with a detailed referral note and copies of her X-rays, and laboratory work. The treatment fulfills all criteria of diagnosis and stabilization of a patient under ... EMTALA.

Docket # 117, Exhibit 1, Copy of Dr. Calimano's Expert Witness Report, page 3.

These conclusions were admitted by plaintiffs' own expert during his deposition. When questioned, plaintiffs' expert, Dr. Silvagnoli–Collazo, admitted that the only thing that he would have done differently in terms of screening plaintiff was performing a rectal examination:

> Q: Okay. What would you have done differently in terms of screening? Let's forget about referral to a surgeon. In terms of screening, in addition to what Dr. Ferrer [sic] would have done?
>
> A: Well, the rectal examination.
>
> Q: Anything else?
>
> A: No.

Docket # 117, Exhibit 2, p. 54, Dr. Arturo Silvagnoli–Collazo's Deposition.

When pressed by the defense regarding the relevance or significance of performing the rectal examination, Dr. Silvagnoli–Collazo

---

4. This Court has previously held that EMTALA does not provide a private cause of action against individual physicians. *See Socia–Lebron, supra.* Therefore, our analysis of liability under EMTALA shall be limited to that of HM. However, because Dr. Ferrer continues to be a third party defendant under plaintiffs' medical malpractice claims, we shall utilize the arguments he sets forth in his Motion for Summary Judgment as they pertain to the medical malpractice claims.

had to admit that performing a rectal examination on plaintiff Nilda Torres Nieves would not have aided Dr. Ferrer in identifying the source of her vomiting and reach the diagnosis of appendicitis.

Q: Doctor, I want your opinion right now. My question is very simple. Whether a rectal examination performed on January 15, 1992 would have given you any clue as to what was the cause of the vomiting of Nilda Torres?

A: No.

Q: No clue at all?

A: Hum, um.

Docket # 117, Exhibit 2, p. 60–61, Deposition of Dr. Silvagnoli–Collazo.

Furthermore, even though EMTALA does not require that a participating hospital reach the correct diagnosis in order to determine whether an appropriate medical screening was performed. it appears on plaintiff's medical record, and was admitted by Dr. Silvagnoli–Collazo, that Dr. Ferrer reached a correct potential diagnosis of plaintiffs condition before she was transferred to PRMC: R/O appendicitis acute.

Therefore, it is clear under these facts that Dr. Ferrer conducted an appropriate medical screening of plaintiff in order to determine whether an emergency medical condition existed. The one test that plaintiffs' expert would have performed that was not done on Nilda Torres Nieves was a rectal examination, a test which was admitted by the expert would have had no impact in the correct diagnosis of plaintiffs condition. Moreover, Dr. Ferrer did arrive at a correct potential diagnosis: R/O appendicitis acute. There is no indication that plaintiff received anything but topnotch medical attention while she was treated at HM; she received an appropriate medical screening. Under the undisputed evidence before the Court it is clear that plaintiff cannot base any EMTALA claim on an inadequate medical screening.

This, however, does not end our inquiry under EMTALA. We must also determine whether, at the time of her transfer to the PRMC, plaintiff was stable within the meaning of the statute.

**Plaintiff was stable at the time of her transfer to PRMC**

As stated above, EMTALA's definition of stabilization is such that a patient is stable if no material deterioration is likely to occur within reasonable medical probability as a result of the transfer. In this case, while she was still experiencing abdominal pain, Nilda Torres Nieves' condition did not deteriorate in any way during the transfer from HM to PRMC. Furthermore, there is a consensus in the medical opinion submitted in this matter that plaintiff was stable at the time she was transferred from HM and she was stable at the time she arrived at PRMC, as well as for many hours thereafter. Any damages suffered by plaintiff were the result of a botched operation at the PRMC; not a result of the transfer from HM to PRMC many hours prior to her operation.

Dr. Calimano, defendants' expert witness, stated that HM had complied with all of EMTALA's stabilization requirements. Docket # 117, Exhibit 1, p. 3. In addition, plaintiffs' expert, Dr. Silvagnoli–Collazo, admitted in his deposition that at the time of the transfer plaintiff Nilda Torres Nieves was stable:

Q: Okay. So based on this document you conclude that Nilda Torres was stable.

A: Yes.

Q: On January 16, 1992.

A: Yes.

Docket # 117, Exhibit 2, p. 62, Deposition of Dr. Silvagnoli–Collazo.

Moreover, plaintiff's medical records clearly demonstrate Nilda Torres Nieves' condition at the time of her transfer from HM to PRMC as stable. Docket # 117, Exhibit 3. Dr. Ferrer has also maintained that Nilda Torres Nieves was stable at the time she was transferred and at the time she arrived at the PRMC. Docket # 117, Exhibit 5, Unsworn Declaration of Dr. Dimas Ferrer. It is clear that plaintiff's condition did not materially deteriorate as a result of the transfer. Her provisional diagnosis of R/O appendicitis acute was confirmed by the PRMC emergency room personnel and by the surgeons who operated on her twelve hours following her arrival at PRMC. Dr. Silvagnoli–Collazo ad-

mitted that no material deterioration of plaintiffs' condition resulted from the transfer to PRMC:

> Q: Doctor, is it a fact that the appendicitis that Nilda Torres was developing already had at Hospital Metropolitano never degenerated into peritonitis or any other . . . or more grave disease?
>
> A: That's true.

Docket # 117, Exhibit 2, p. 53, Deposition of Dr. Silvagnoli–Collazo.

It is clear to this Court that plaintiff Nilda Torres Nieves was stable at the time of her transfer from HM to PRMC, and at the time of her arrival at PRMC. It is also an undisputed fact that no material deterioration of her condition resulted from the transfer. There is thus no causal link between HM's legitimate decision to transfer a stable patient who had been more than adequately screened and any potential malpractice that plaintiff suffered at the hands of PRMC surgeons many hours after her arrival at PRMC.

■ While it would be laudable for private hospitals to never transfer patients to a public hospital based on their inability to pay, EMTALA does not impose such a duty on participating hospitals. If the hospital complies with the adequate screening and stabilization requirements, as HM clearly did in this case, no liability arises under EMTALA. Plaintiffs attempt to impose such a duty on defendants in this case, both under EMTALA and the medical malpractice claims. However, the mere fact that a private hospital transfers a stable patient to a public hospital where she later encounters faulty medical care cannot establish a causal link between the private hospital's actions and the damages suffered by the patient. It is clear from Dr. Silvagnoli–Collazo's expert witness report that plaintiffs are attempting to impose this type of strict liability upon private hospitals:

> The expert's understanding is that . . . the primary doctor and the Administration of the Metropolitan Hospital were the ones responsible for the fact that this patient was not hospitalized and operated on by an experienced surgeon, which would have

prevented the series of complications that arose in this case in unexperienced hands.

Docket # 117, Exhibit 4, p. 4, Dr. Silvagnoli–Collazo's expert witness report.

This statement succinctly summarizes both the EMTALA claim and the medical malpractice claim against HM and Dr. Ferrer: if only HM had not transferred plaintiff, inexperienced surgeons would not have operated on her and caused her harm. However, as stated above, neither EMTALA nor prevailing medical malpractice doctrine create an independent source of responsibility for a private hospital that treats a patient adequately and then transfers her in a manner where her condition is not likely to deteriorate. A private hospital cannot be the guarantor of sound medical care in the transferee public hospital; it can only be responsible that its own actions in treating and transferring the patient will not be an independent source of harm.

**Applicable Law—Puerto Rico Medical Malpractice Doctrine**

■ As stated above, we hear plaintiffs' medical malpractice claims against HM based on diversity jurisdiction. We must therefore turn to the substantive law of Puerto Rico to establish the elements of a medical malpractice cause of action under Puerto Rico law. As summarized by the First Circuit in *Rolon–Alvarado v. Municipality of San Juan*, 1 F.3d 74, 77 (1st Cir. 1993),

> [t]o establish a prima facie case of medical malpractice under that law, a plaintiff must adduce evidence showing at least three separate things: (1) the duty owed, expressed as the minimum standard of professional knowledge and skill required under the circumstances then obtaining; (2) a breach of that duty attributable to the defendant; and (3) a sufficient causal nexus between the breach and the plaintiff's claimed injury.

■ In determining a physician's duty of care, Puerto Rico law has established a universal standard. "In other words, a health-care provider has a duty to use the same degree of expertise as could reasonably be expected of a typically competent practi-

tioner in the identical specialty under the same or similar circumstances, regardless of regional variations in professional acumen or level of care." *Id.* at 77–78. There is a presumption in Puerto Rico law that the treating physician exercised a reasonable degree of care, a presumption that must be refuted by the plaintiff. *Id.* at 78. *citing Del Valle Rivera v. United States,* 630 F.Supp. 750, 756 (D.Puerto Rico, 1986). *See also Lama v. Borras,* 16 F.3d 473, 478 (1st Cir. 1994) ("Instead of simply appealing to the jury's view of what is reasonable under the circumstances, a medical malpractice plaintiff must establish the relevant national standard of care.") Ordinarily, the minimum reasonable standard of care must be established through expert witness testimony. *Id., citing Oliveros v. Abreu,* 101 D.P.R. 209, 226, 1 P.R. Sup.Ct. Off'l Translations 293, 313, 1973 WL 35678 (1973).

"[A]n error of judgment regarding diagnosis or treatment does not lead to liability when expert opinion suggests that the physician's conduct fell within a range of acceptable alternatives." *Id.* Thus, even when a physician has misdiagnosed a patient, if his treatment fell within the contours of acceptable medical options, he will not be liable for malpractice in Puerto Rico. Only when a physician has failed to comply with the basic norms comprised in the national standard of care may he be held liable for medical malpractice.

Finally, there must be a causal link between the physician's negligent conduct and the harm suffered by the plaintiff. "A plaintiff must prove, by a preponderance of the evidence, that the physician's negligent conduct was the factor that 'most probably' caused harm to the plaintiff." *Id.* That said, however, causality need not be established with mathematical certainty; but, "[a]s is the case of duty, however, a jury normally cannot find causation based on mere speculation and conjecture; expert testimony is generally essential." *Id.*

As summarized by the First Circuit in *Rolon–Alvarado,* "tort law neither holds a doctor to a standard of perfection nor makes him an insurer of his patient's well-being. Professional standards require normative judgments, not merely proof that a better way to treat a particular patient could have been devised." *Rolon–Alvarado,* 1 F.3d at 78.

## Analysis—Medical Malpractice Claim

In their Motions for Summary Judgment, neither HM nor Dr. Ferrer argue that plaintiffs have failed to establish an adequate national standard of care. We shall thus not engage in an analysis of whether plaintiffs have complied with the first requirement of a successful medical malpractice claim. This is particularly so because we believe that plaintiffs have failed to meet their burden on the second two prongs of the test: deviation from national standard of care, and causation. It is in this light that we shall analyze Dr. Ferrer's treatment of plaintiff Nilda Torres Nieves at HM to determine whether Dr. Ferrer or HM could be held liable for medical malpractice.[5]

In so doing, in order to avoid unnecessary duplication, we hereby incorporate our examination of the treatment received by plaintiff at HM in our discussion of the EMTALA claims. We shall only add to our analysis plaintiff's claim that the medications she was given at HM served to mask her symptoms and should not have been administered.

## Dr. Ferrer and HM did not deviate from the national standard of duty of care

As discussed above, there is absolutely no evidence on the record to indicate that Nilda Torres Nieves received anything but top-notch care during her stay at HM. Dr. Ferrer and the HM staff examined plaintiff, monitored her condition, and administered several laboratory tests, including blood and urine analyses, as well as x-rays. Furthermore, she was given what has been characterized as defendants' expert as necessary medication, designed to alleviate her

5. As the Court noted above, plaintiffs voluntarily dismissed all of their claims against Dr. Ferrer at an earlier stage of the proceedings. We thus discuss Dr. Ferrer's liability for medical malpractice only insofar as he was brought in as a third party defendant by HM in an indemnity action.

nausea and pain, as well as to prevent dehydration.

Plaintiffs claim that Nilda Torres Nieves was misdiagnosed with having gastroenteritis and that the medications given to her by Dr. Ferrer served to "mask" her symptoms and should thus not have been administered. As stated above, we hereby incorporate our previous analysis on the EMTALA claims where we determined that plaintiff had received an adequate medical screening while at HM. In that discussion, we highlighted that it was admitted by plaintiffs' own expert that the only thing he would have done differently for plaintiff in terms of screening was to perform a rectal examination. However, as stated above, performing a rectal examination would not have aided Dr. Ferrer in reaching the correct diagnosis of appendicitis acute. Even though an adequate medical screening under EMTALA is not always equivalent to adequate treatment under medical malpractice doctrine, in this case Dr. Ferrer's and HM's treatment of plaintiff while she was at HM complied with both the adequate medical screening requirement of EMTALA and the duty of care standard under medical malpractice doctrine.

Furthermore, even though plaintiffs claim that Dr. Ferrer misdiagnosed plaintiff's condition as gastroenteritis, that assertion is belied by the uncontroverted documentary evidence that gastroenteritis was only an initial, working diagnosis and that Dr. Ferrer, after performing all the necessary tests, reached the correct diagnosis as one of two potential conditions being suffered by plaintiff.

Finally, we address plaintiffs' claims that Dr. Ferrer and HM engaged in medical malpractice because the medications that she was given served to "mask" her symptoms and were thus improperly administered. Defendants' expert, Dr. Calimano, found that the medications given were proper and were designed to alleviate some of the pain, and prevent plaintiff from dehydrating. However, because the Court may not weigh the medical expert evidence at the summary judgment stage, see *Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d 184, 190 (1st Cir.1997), we must look to plaintiffs' expert, Dr. Silvagnoli–Collazo, to see if he properly countered Dr. Calimano's assertions so as to create a genuine issue of material fact. In examining Dr. Silvagnoli–Collazo's admissions in his deposition regarding the medications given to plaintiff, it is clear that plaintiff's bare assertions that the medications were not indicated because they served to "mask" her symptoms are not supported by any evidence in the record. In so finding, we examined Dr. Silvagnoli–Collazo's deposition where he admitted that there is nothing in the record to bolster the claim that the medications given to Nilda Torres Nieves served to mask her symptoms:

Q: Now, what do you understand to have been Nilda Torres' most outstanding or significant symptom on January 15, 1992?

A: Well, abdominal pain.

Q: Okay, another question. Was abdominal pain ... and I'm referring to the record specific in this case ... was abdominal pain actually masked by the medication that was given to Nilda Torres at Hospital Metropolitano?

A: What?

Q: Was abdominal pain masked?

A: Well, I have to assume that but...

Q: You have to assume?

A: Yes, because the medication was for sedation.

Q: Okay, but do you have any medical notes that would support your assumption that the abdominal pain of Nilda Torres was masked in this case?

A: You mean literature?

Q: No. I'm talking about the documents of the treatment ... basically the medical records in this case.

A: Well, I can't tell you that.

Q: You can't...

A: She was referred there with abdominal pain and vomiting.

Q: Yeah, but my question is not that. My question is whether ... you told me before that you 'assumed' ...

A: Um hum.

Q: ... that the medication given by Dr. Ferrer masked the symptoms.

A: I said "could mask".

Q: "Could mask". My question is whether you have any document from the medical record or from anywhere else but in this specific case, that her abdominal pain was actually masked?

A: Not really.

Q: So you don't know if it was masked or not?

A: No.

Docket # 117, Exhibit 2, p. 52, Deposition of Dr. Silvagnoli–Collazo.

As can be gleaned from this extensive portion of Dr. Silvagnoli–Collazo's deposition, there is no evidence that the medications administered at HM had any adverse effect on plaintiff's condition. Plaintiffs have failed to counter the presumption that the treatment given at HM was reasonable, and have clearly failed to link the administered medication to any actual negative effect on plaintiff's medical condition.

In short, it is clear to the Court from the uncontroverted facts in evidence that plaintiff received more than adequate care while she was at HM. Plaintiffs cannot point to a single area of her treatment where either Dr. Ferrer or HM failed to comply with the duty of care standard. Dr. Ferrer performed all the necessary tests and reached the correct diagnosis; there is no evidence that the treatment received by plaintiff was in any way deficient.

**There is no causal link between the harm suffered by plaintiff and her treatment at HM**

█ Even if plaintiffs had been successful in raising a genuine issue of material fact regarding the quality of care administered to Nilda Torres Nieves at HM, which they were not, they have failed to establish a causal link between the actions undertaken by Dr. Ferrer and HM and the damages suffered by plaintiff, particularly the loss of her kidney.

It is significant to note that plaintiffs in this case did not sue the Emergency Department of the Puerto Rico Medical Center because it was their belief that they had adequately screened and referred patient to the surgery department. However, there is no significant difference in the treatment that plaintiff Nilda Torres Nieves received while at the Emergency Department at PRMC and the treatment she received at HM. It is clear that the damages suffered by plaintiff did not result from the screening or the preliminary treatment she received at the emergency room in either hospital; rather, it was a mistake committed during her surgery at PRMC that is the cause of her damages.

Dr. Silvagnoli–Collazo admitted that the principal damage suffered by plaintiff was the loss of her kidney as a result of the laceration of her ureter during the appendectomy performed by surgeons at the PRMC. Docket # 117, Exhibit 2, p. 45, Dr. Silvagnoli–Collazo's Deposition. Plaintiffs' expert does not point to a single action or omission by HM or Dr. Ferrer that can be linked to plaintiffs' damages. There was no error in the diagnosis, all the relevant tests were performed, and there is no evidence that any of her symptoms were masked. In fact, the assertion that the symptoms were masked is belied not only by Dr. Silvagnoli–Collazo's own admissions, but also by the fact that once at the PRMC Dr. Ferrer's R/O diagnosis of appendicitis acute was confirmed by the emergency room personnel at the PRMC.

Furthermore, any causal link between plaintiff's treatment at HM and the ultimate harm that she suffered is virtually obliterated by the amount of time that passed between her transfer to PRMC and the appendectomy, over twelve hours. There was unrebutted testimony from Dr. Calimano that the effect of the medications given to Nilda Torres Nieves would have long faded by the time that she was eventually operated on at PRMC. See Docket # 117, Exhibit 1, p. 3, Dr. Calimano's expert witness report.

In short, there is absolutely no causal link between any acts or omissions by HM or Dr. Ferrer and plaintiff's ultimate harm: the pain and suffering, and loss of a kidney, resulting from the botched appendectomy. Viewing the evidence in the light most favorable to the plaintiffs, there is simply no basis for holding Dr. Ferrer or HM liable for the damages suffered by plaintiff. The treatment she was afforded at HM was of the

highest quality. As we stated above, it would be most improper to find a private hospital liable for the malpractice that occurred at a public hospital, merely because the private hospital transferred the patient, where there was no risk to the patient stemming from the transfer itself.

**Conclusion**

The Court finds that there are no genuine issues of material fact that would preclude the granting of summary judgment at this stage in favor of defendants. This is a well-developed record, where all parties have had ample opportunity to conduct discovery. We find that there is no evidence on the record to support a claim of either failure to adequately screen or failure to stabilize plaintiff in violation of EMTALA. Furthermore, we find that plaintiffs have clearly failed to establish that either Dr. Ferrer or HM breached the national standard of duty of care or that there is any causal link between the treatment plaintiff received at HM and any damages that she has suffered. There is thus no basis for holding Dr. Ferrer or HM liable for medical malpractice under Puerto Rico law.

Pursuant to the above discussion, Dr. Ferrer's and Hospital Metropolitano's Motions for Summary Judgment (**Dockets # 117, 120**) are **GRANTED.** The above-captioned action is therefore **DISMISSED .** Judgment will be entered accordingly.

**SO ORDERED.**