Denise **FEIGHERY**, Plaintiff,

v.

**YORK HOSPITAL, Samuel M. DiCapua, D.O., and Karen O'Neill, M.D., Defendants.**

No. CIV. 98–210–P–C.

United States District Court, D. Maine.

July 2, 1999.

**98**

Jonathan S.R. Beal, Fontaine & Beal, P.A., Portland, ME, for Plaintiff.

Ernest J. Babcock, Elizabeth A. Germani, Friedman, Babcock & Gaythwaite, Portland, ME, for Defendant York Hospital and Karen O'Neill, MD.

Steven J. Mogul, Gross, Minsky, Mogul & Singal, P.A., Bangor, ME, for Samuel M. Dicapua, DO.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Plaintiff Denise Feighery, seeks damages for the death of her husband, Kevin Feighery, from Defendants York Hospital, Samuel M. DiCapua, D.O., and Karen O'Neill, M.D. In Counts VIII, IX, and X of her nine-count Amended Complaint[1] (Docket No. 33), Plaintiff alleges that Defendant York Hospital violated the Emergency Medical Treatment and Active Labor Act ("the EMTALA" or "the Act"), 42

1. Count VII was withdrawn.

2. The Court notes that Plaintiff's claims under the EMTALA are apparently time barred. Title 42 U.S.C.A. § 1395dd(d)(2)(C) provides that no action may be brought under the EMTALA more than two years after the date of the violation with respect to which the action is brought. The events that allegedly

U.S.C. § 1395dd et seq., and seeks damages on behalf of the estate, herself, and her minor children. Before the Court is York Hospital's motion for summary judgment on Counts VIII, IX, and X of Plaintiff's Amended Complaint (Docket No. 43) wherein it argues that no dispute exists as to material facts that could show that it violated the EMTALA. For the reasons set forth below, the Court will grant York Hospital's motion for summary judgment.[2]

## I. STANDARD OF REVIEW

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. See Fed.R.Civ.P. 56(c). Once the moving party has come forward identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" which "it believes demonstrate the absence of a genuine issue of material fact," the adverse party may avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2551–52, 91 L.Ed.2d 265 (1986).

The trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs–Ryan v. Smith, 904 F.2d 112, 115 (1st Cir.1990). The court will not, however, pay heed to "conclusory allegations, improbable inferences [or] unsupported speculation." Medina–Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990). Because York

violate the EMTALA in this case occurred on July 9, 1994. Plaintiff filed her initial Complaint on June 8, 1998, more than two years after that date (Docket No. 1). The Court will not dismiss Plaintiff's claims on this ground because York Hospital waived this affirmative defense when it did not plead it in its Answer (Docket No. 3).

Hospital has moved for summary judgment, where the facts are in dispute, the Court presents them in the light most favorable to Plaintiff.

## II. BACKGROUND

The following summary of facts is based on the factual allegations of the parties supported by appropriate citations to the record. Where a factual allegation is disputed, all reasonable inferences are drawn in Plaintiff's favor.

At approximately 8:16 p.m., just over three hours after his admittance to York Hospital on July 9, 1994, Kevin Feighery suffered a seizure due to myocardial infarction which ultimately resulted in his death. *See* Emergency Room Record ("ER Record"); York Hospital 24–EKG Documentation, Plaintiff's and Defendant's Statement of Material Facts, Exhibits C, F. When Kevin Feighery arrived at York Hospital he felt nauseated and had suffered a "syncopal episode" [3] after eating clams with his family on vacation. *See* ER Record; Deposition of Claude Desveaux, R.N. ("Desveaux Deposition") at 28–30; Deposition of Denise E. Feighery ("Feighery Deposition") at 29–30. He was alert and oriented, but still felt nauseated when he checked in to the emergency room. *See* Desveaux Deposition at 26, 30, 34, 39; Deposition of Samual DiCapua, D.O. ("DiCapua Deposition") at 21, 45–46; Feighery Deposition at 46–47. Upon his arrival, Kevin Feighery was assessed by an emergency room nurse, Claude Desveaux, R.N., and approximately half an hour later, he was assessed again by Samual DiCapua, D.O., the attending emergency room physician. *See* ER Record; Desveaux Deposition at 30; DiCapua Deposition at 21.

Nurse Desveaux accepted Mr. Feighery from the ambulance and conducted the initial assessment which included interviewing Mr. and Mrs. Feighery about his symptoms. *See* ER Record; Desveaux Deposition at 28; DiCapua Deposition at 21. On Mr. Feighery's ER Record, Nurse Desveaux reported that Mr. Feighery had experienced a sudden onset of severe nausea and vomited several times after he ate seafood. *See* ER Record. He further reported that Mr. Feighery's skin was wet and pale but that he was awake, alert, and oriented when he arrived at the emergency room. *See* Desveaux Deposition at 30. The ER Record reflects that Plaintiff told Nurse Desveaux about the syncopal episode her husband had suffered earlier that day. *See* ER Record. There is no indication in the summary judgment record that Kevin Feighery complained of chest pain when he arrived at the hospital.[4] *See* ER Record; Desveaux Deposition at 66–67, 82; DiCapua Deposition at 22–23.

At 5:45 p.m., Dr. DiCapua met with Kevin Feighery and his wife. *See* ER Record; Desveaux Deposition at 31. Dr.

---

3. "Syncopal" is defined as "of, relating to, or characterized by syncope." *Websters Third New International Dictionary,* 2319 (1981). "Syncope" is defined as "a faint an episodic pause in the stream of consciousness due to cerebral hypoxia, of an abrupt onset and brief duration and from which recovery is usually complete." *Blakiston's Gould Medical Dictionary, 4th ed.* 1337 (McGraw Hill 1979).

4. Although in her deposition Plaintiff mentions that her husband had a complaint about chest pressure in the emergency room when Dr. O'Neill was the treating physician, *see* Feighery Deposition at 8–9, this is not material to whether Mr. Feighery presented the symptoms including chest pain when he was screened. There is no indication that Mr. Feighery communicated that he was experiencing chest pain or pressure when he arrived at the emergency room and was assessed for purposes of his medical screening. Plaintiff does not dispute that Mr. Feighery did not complain of chest pain. *See* Plaintiff's and Defendant's Statement of Material Facts ¶ 7. Mr. Feighery's complaint to Dr. O'Neill occurred after Dr. DiCapua diagnosed Mr. Feighery with enteritis and, thus, after he was screened by Dr. DiCapua. Whether Dr. O'Neill responded appropriately to Mr. Feighery's complaints regarding chest pressure after he was screened and diagnosed are relevant to whether Mr. Feighery was treated according to the required standard of care and are not relevant to whether he was appropriately screened.

DiCapua reported in the ER Record that Mr. Feighery had experienced a four-minute-long syncopal episode approximately four hours after eating clams and was weak with nausea and vomiting. *See* ER Record; DiCapua Deposition at 21–22. The *doctor further* noted that Mr. Feighery was awake, alert, and verbal during the examination, that he had a normal sinus rhythm, a regular heartbeat, clear lungs, no guarding, rebound, or rigidity, no clubbing, cyanosis, or edema in his extremities, and that his abdomen was unremarkable. *See id.* Dr. DiCapua recalls that he asked Kevin Feighery whether he had any chest pain and whether he had a history of cardiac illness. *See* DiCapua Deposition at 22–23, 35.[5] Dr. DiCapua did not ask Mr. Feighery about specific cardiac illness risk factors such as smoking, family history of heart problems, hypertension, medical history, or diet. *See* DiCapua Deposition at 38–43; Feighery Deposition at 90–91.[6]

Dr. O'Neill took over for Dr. DiCapua at 6:05 p.m., and Dr. DiCapua advised Dr. O'Neill that the diagnosis was "vomiting and diarrhea" and that, based on a lack of chest pain and normal cardiogram, there was no question of a cardiac problem. *See* O'Neill Deposition at 100–01. Dr. DiCapua considered whether Kevin Feighery had a heart problem but ruled that out as a possibility when he transferred care to Dr. O'Neill. *See* ER Record; DiCapua Deposition at 26–27, 60–62; O'Neill Deposition at 100–01. Dr. O'Neill, who took over Mr. Feighery's care, similarly did not take a detailed cardiac risk history of Mr. Feighery in the emergency room but testifies that she would normally do so if she suspected a cardiac problem. *See* Deposition of Karen O'Neill, M.D. ("O'Neill Deposition") at 99–101. Dr. O'Neill admitted Kevin Feighery to the hospital with a primary diagnosis of intractable vomiting, believed to be the result of enteritis, with a secondary diagnosis of syncope episode. *See* ER Record; O'Neill Deposition at 19–21, 27–28. Plaintiff disagreed with Dr. DiCapua and Dr. O'Neill's diagnoses and repeatedly contended that her husband may be having a heart attack and should be screened for a cardiac condition. *See* Feighery Deposition at 7–10, 19–21, 26, 39, 46–47.

Before being admitted to the hospital, Kevin Feighery was observed in the emergency room for approximately two hours. During that time York Hospital administered tests to diagnose Mr. Feighery's emergency condition. Because Mr. Feighery had experienced a syncopal episode, Dr. DiCapua administered an EKG on him which rendered a normal cardiogram. *See* DiCapua Deposition at 62–64; Desveaux Deposition at 61–62; O'Neill Deposition at 103. In addition, Mr. Feighery was placed on a heart monitor for the entire time that he remained in the emergency room. *See* Desveaux Deposition at 55–56, 61–63. Dr. DiCapua administered a CK enzyme test which indicates whether a patient has had a myocardial infarction in the past. *See* DiCapua Deposition at 68. The test result was negative. He was also placed on telemetry, a second heart monitoring device, prior to being moved from the emergency department to his room. *See* Desveaux Deposition at 55–56, 61–63; O'Neill Deposition at 44–46. The heart monitors are capable of printing paper strips that indicate whether the patient has a change in

---

5. There is no indication in the ER Record that Dr. DiCapua asked these questions. *See* ER Record. However, Dr. DiCapua explains that he would have recorded this information only if it revealed that Mr. Feighery had a negative cardiac history. *See* DiCapua Deposition at 23, 35.

6. Dr. DiCapua and Dr. O'Neill claim that *they do not recall* whether they asked Mr. Feighery about cardiac risk factors. The summary judgment record indicates that Plaintiff told Dr. DiCapua that her husband smoked and Dr. O'Neill asked Plaintiff about family medical history. *See* Feighery Deposition at 20–21. However, for purposes of summary judgment, the Court will give Plaintiff, the non-moving party, the benefit of the inference that York Hospital medical personnel did not take Mr. Feighery's complete cardiac risk factor history.

heart rate and should be examined. *See* DiCapua Deposition at 113–14. It is the responsibility of the nurses and the treating physician to monitor the telemetry. *See* DiCapua Deposition at 120–22; O'Neill Deposition at 45–46. There is no dispute that the monitor strips preserved from 6:57 p.m. show that there was an elevation of approximately two blocks in Kevin Feighery's ST segment which, according to Plaintiff's experts, indicates that he was suffering from an acute ischemia.[7] *See* O'Neill Deposition at 68–69. However, this was not detected by a nurse on duty nor reported to either treating physician.

Mr. Feighery was ultimately treated in the emergency room for intractable vomiting and nausea. Nurse Desveaux administered compazine for the nausea and vomiting at 5:35 p.m. *See* ER Record; Desveaux Deposition at 40. At 6:50 p.m., Mr. Feighery was provided with reglan and intravenous fluids to ease these symptoms. *See* ER Record; Desveaux Deposition at 40, 68–69. When the treatment was ineffective, Mr. Feighery was admitted to the hospital by Dr. O'Neill for "intractable nausea and vomiting" and was transported to his room at 7:20 p.m. He died of myocardial infarction less than an hour thereafter.

## III. DISCUSSION

Plaintiff's EMTALA claims hinge on York Hospital's alleged failure to comply with the statute's medical screening provisions. *See* 42 U.S.C.A. § 1395dd(a). In the medical context, the EMTALA requires a participating hospital (defined as a hospital that has entered into Medicaid provider agreements under section 1395cc of Title 42) that has an emergency department to provide an "appropriate medical screening" to any individual who presents himself or herself to the emergency room and requests an examination or treatment for a medical condition. *See* 42 U.S.C.A.

§ 1395dd(a), (e)(2); 42 U.S.C.A. § 1395cc; *Mayda Lopez–Soto v. Hawayek,* 175 F.3d 170, 172 (1st Cir.1999). Section 1395dd(d)(2)(A) grants a personal right of action to "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section."

In describing the private cause of action, the Court of Appeals for the First Circuit stated that,

> [t]o establish an EMTALA violation, a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department ... (2) the patient has arrived at the facility seeking treatment; and (3) the hospital ... (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition ...

*Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1190 (1st Cir.1995) (citing *Miller v. Medical Center of S.W. Louisiana,* 22 F.3d 626, 628 (5th Cir.1994); *Stevison by Collins v. Enid Health Sys., Inc.,* 920 F.2d 710, 712 (10th Cir.1990)). York Hospital does not dispute that it is a covered entity under the EMTALA, that it operates an emergency department, and that Kevin Feighery arrived at its emergency room seeking treatment. Plaintiff's Statement of Material Facts ¶¶ 2, 16; Defendant's Statement of Material Facts ¶ 2. York Hospital maintains that Kevin Feighery received an appropriate screening, within the meaning of the EMTALA, when he arrived at York Hospital, but Plaintiff disagrees.

■ The EMTALA was enacted in 1986 in response to a distinct and narrow problem—namely, the national concern that uninsured, underinsured, and indigent patients were being "dumped" onto other hospitals by hospitals who did not want to treat them. *See Summers v. Baptist Med-*

---

7. "Ischemia" is defined as local diminution in the blood supply due to obstruction of inflow of arterial blood or to vasoconstriction. *Blak-iston's Gould Medical Dictionary, 4th ed.* 703 (McGraw Hill 1979).

*ical Center Arkadelphia,* 91 F.3d 1132, 1136 (8th Cir.1996); *Correa,* 69 F.3d at 1189; *Baber v. Hosp. Corp. of America,* 977 F.2d 872, 880 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1039 (D.C.Cir.1991). The Act was intended to create a wholly new cause of action to address this narrow health problem, separate and distinct from traditional state medical malpractice claims. *See Summers,* 91 F.3d at 1137 (citing *Gatewood,* 933 F.2d at 1041). Numerous courts have noted explicitly that the EMTALA is not to be treated like a federal malpractice statute. *See Marshall v. East Carroll Parish Hosp.,* 134 F.3d 319, 322 (5th Cir.1998); *Summers,* 91 F.3d at 1137; *Vickers v. Nash Gen. Hosp.,* 78 F.3d 139, 142 (4th Cir.1996); *Correa,* 69 F.3d at 1192–93; *Eberhardt v. City of Los Angeles,* 62 F.3d 1253, 1258 (9th Cir.1995); *Repp v. Anadarko Municipal Hosp.,* 43 F.3d 519, 522 (10th Cir.1994); *Holcomb v. Monahan,* 30 F.3d 116, 117 (11th Cir.1994); *Baber,* 977 F.2d at 879–80; *Gatewood,* 933 F.2d at 1041; *Torres Nieves v. Hosp. Metropolitano,* 998 F.Supp. 127, 132 (D.P.R.1998); *Socia–Lebron v. Ashford Presbyterian Hosp.,* 995 F.Supp. 241, 243 (D.P.R.1998); *Scott v. Hutchinson Hosp.,* 959 F.Supp. 1351, 1357 (D.Kan.1997); *Tank v. Chronister,* 941 F.Supp. 969, 972 (D.Kan.1996); *Hart v. Mazur,* 903 F.Supp. 277, 280 (D.R.I.1995). Accordingly, the Act does not require a covered hospital to provide a uniform minimum level of care to each patient seeking emergency care and does not provide a private cause of action against a treating hospital for misdiagnosis or improper medical treatment, areas traditionally covered by state malpractice law. *See Marshall,* 134 F.3d at 322; *Summers,* 91 F.3d at 1137; *Vickers,* 78 F.3d at 142; *Holcomb,* 30 F.3d at 117; *Baber,* 977 F.2d at 880; *Gatewood,* 933 F.2d at 1041; *Torres Nieves,* 998 F.Supp. at 132 (citing Barry R.

Furrow, *An Overview and Analysis of the Impact of the Emergency Medical Treatment and Active Labor Act,* 16 J. Legal Med. 325 (Sept.1995)); *Tank,* 941 F.Supp. at 972.

With this rationale and purpose in mind, the Court of Appeals for the First Circuit has stated that "[t]he essence of the requirement is that there be some screening procedure, and that it be administered even-handedly." *Correa,* 69 F.3d at 1192. That court continued to define "appropriate medical screening" and specifically stated,

[a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides the level of screening uniformly to all those who present substantially similar complaints.... [Thus] a refusal to follow regular screening procedures in a particular instance contravenes the statute, but faulty screenings in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute.

*Correa,* 69 F.3d at 1192–93. United States Courts of Appeal from other circuits agree that under the EMTALA, patients are entitled not to correct or nonnegligent treatment in all circumstances, but to be treated as other similarly situated patients are treated, within the hospital's capability. *See Marshall,* 134 F.3d at 323; *Summers,* 91 F.3d at 1138–39 (*citing Correa,* 69 F.3d at 1192–93).[8] Thus, an "appropriate medical screening examination" is not judged by its proficiency in accurately diagnosing the patient's illness. The essence of an EMTALA claim is disparate treatment; to state a claim under the EMTALA, the plaintiff must show that he or she was

---

**8.** This is in accord with the statute's legislative history which shows that Congress enacted the EMTALA not to improve the overall standard of medical care, but to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay. *See* H.R.Rep. No. 241, 99th Cong., 1st Sess. (1986), reprinted in 1986 U.S.C.A.A.N. 726–27.

given a screening that was different from that afforded as a matter of course to patients presenting the same symptoms. *See Marshall,* 134 F.3d at 323 (defining an appropriate medical screening as "a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms"); *Summers,* 91 F.3d at 1138 (stating that "[i]t is up to the hospital itself to determine what its screening process will be [and] . . . [h]aving done so, it must apply them alike to all patients"); *Vickers,* 78 F.3d at 144 (holding that the "EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment; it is not implicated whenever individuals who turn out in fact to have had the same condition receive disparate treatment"); *Correa,* 69 F.3d at 1192 (holding that "[t]he essence of [the EMTALA's requirement] is that there be some screening and that it be administered evenhandedly"); *Eberhardt,* 62 F.3d at 1258 (holding that "the test is whether the challenged procedure was identical to that provided similarly situated patients, as opposed to whether the procedure was adequate as judged by the medical profession"); *Williams v. Birkeness,* 34 F.3d 695, 697 (8th Cir.1994) (affirming district court's dismissal of the EMTALA claim because plaintiff failed to show that he was treated differently than other patients); *Holcomb,* 30 F.3d at 117 (holding that "[a]s long as a hospital applies the same screening procedures to indigent patients which it applies to paying patients, the hospital does not violate this section of the Act"); *Baber,* 977 F.2d at 881 (holding that "the critical element of an EMTALA cause of action is not the adequacy of the screening examination but whether the screening examination that was performed deviated from the hospital's evaluation procedures that would have been performed on any patient in a similar condition"). Accordingly, in resolving a claim of failure to screen under the EMTALA, a court should ask whether the hospital adhered in the case at hand to the emergency screening standards that it applies to all patients showing the same symptoms as the patient presenting him or herself to the emergency room. Furthermore, it is Plaintiff's burden on summary judgment to demonstrate that the patient received a disparate medical screening as compared to routine standards in similar cases and not the duty of the defendant hospital to persuade the Court that all patients are screened the same or that the screening was adequate. *See Williams,* 34 F.3d at 697.

Here, Plaintiff does not allege that Kevin Feighery was not screened at all by York Hospital when he presented himself to the emergency room. In addition, Plaintiff concedes that she must show sufficient evidence of nonuniform or disparate treatment in order to succeed. She takes the position, however, that she meets this requirement by presenting evidence that York Hospital deviated from its own screening procedures when it screened her husband. Plaintiff reasons that because she has presented sufficient evidence that York Hospital departed from its own screening procedures for patients exhibiting the same symptoms as Mr. Feighery when it treated him, she has presented sufficient evidence that Mr. Feighery received disparate treatment from that provided similarly situated patients presenting the same symptoms.[9]

9. Plaintiff also contends that York Hospital failed and refused to act upon significant evidence that Kevin Feighery was suffering from a cardiac injury and not enteritis from clams. This argument goes directly to whether York Hospital properly diagnosed and treated Kevin Feighery and is beyond the scope of section 1395dd(a) of the EMTALA which is concerned with preventing an inappropriate medical screening rather than a misdiagnosis. *See Vickers,* 78 F.3d at 141; *Torres Nieves,* 998 F.Supp. at 132 (citing Barry R. Furrow, *An Overview and Analysis of the Impact of the Emergency Medical Treatment and Active Labor Act,* 16 J. Legal Med. 325 (Sept.1995)). Accordingly, the Court rejects this line of argument.

The Court must resolve the threshold issue of whether Plaintiff's argument presents a claim under the EMTALA. She cites several cases that support her contention that she can survive summary judgment on a claim under the EMTALA by presenting sufficient evidence that York Hospital did not follow its own screening standards in the patient's case. *See Gatewood,* 933 F.2d at 1041 (holding that "a hospital fulfills the 'appropriate medical screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures. By the same token, any departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act."); *see also Repp,* 43 F.3d at 523; *Scott,* 959 F.Supp. at 1357; *Hutchinson v. Greater Southeast Community Hosp.,* 793 F.Supp. 6, 8 (D.D.C.1992). The language in these cases do suggest that disparate treatment may be shown by presenting evidence that a hospital departed from its own screening procedures.

The United States Court of Appeals for the Eighth Circuit disagrees with the foregoing courts' conclusions. In *Summers,* that court held that plaintiff's evidence that the defendant hospital normally gave an x-ray to a patient complaining of snapping and popping noises in his chest, but did not do so in the case of the plaintiff who made the same complaint, did not state a claim under the EMTALA. *See Summers,* 91 F.3d at 1138–39. That court reasoned that "it would almost always be possible to characterize negligence in the screening process as non-uniform treatment, because any hospital's screening process will presumably include a non-negligent response to symptoms or complaints presented by a patient." *Id.* The court in *Summers* cited the United States Court of Appeals for the First Circuit's decision in *Correa* as support for its proposition. However, the Court disagrees with the proposition that the language in *Correa* forecloses Plaintiff's argument.

After upholding a jury verdict for the patient's survivors because the hospital failed to screen the patient at all, the court carefully explains that,

EMTALA does not create a cause of action for medical malpractice.... Therefore, a refusal to follow regular screening procedures in a particular instance contravenes the statute, ... but faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute.

*Correa,* 69 F.3d at 1192–93. The court in *Summers* concluded that a screening where a hospital departs from its own procedures is a "faulty screening" which does not come within the EMTALA. However, this Court finds that it is not entirely clear that a screening where a hospital refuses to follow regular screening procedures is not a "disparate screening" which does come within the EMTALA. The Court of Appeals stated that "a refusal to follow regular procedures in a particular instance contravenes the statute." *Id.* Without further guidance from the Court of Appeals, the Court concludes that a plaintiff can show a disparate screening under the EMTALA by showing that a hospital refused to follow its own screening procedures in a particular instance. The Court concludes that Plaintiff's argument could be a basis for a claim under the EMTALA and will now analyze whether Plaintiff has presented sufficient evidence that York Hospital departed from the essential elements of its screening examination in this instance.

The Court must first set forth York Hospital's screening procedures for patients arriving at the emergency room who have had a syncopal episode, have vomited, and are nauseated. Plaintiff submits York Hospital's written standing orders entitled Physician/Nurse Protocols (hereinafter "Protocols") contained in a policy book kept in the emergency room. Desveaux Deposition at 91–93; York Hospital Emergency Room Physician Nurse Protocols,

Plaintiff's Statement of Material Facts, Exhibits M, O. The Protocols require certain actions to be taken for patients depending on what symptoms they present. For patients who arrive at the emergency room who present "syncope," as Mr. Feighery did here, the Protocols require that the patient be placed on a cardiac monitor, be given 4–6 liters of oxygen, be put on an IV, be given a cardiac protocol, be administered an EKG, be weighed, and be given neuro checks. *See* Protocols.

The record also shows that the physicians have standard screening procedures that, more or less, coincide with the screening procedures mandated by the Protocols. The fact that these procedures are not kept in written form does not mean that they are not implicated as the York Hospital's regular screening procedures. York Hospital has submitted for purposes of summary judgment an affidavit by Dr. O'Neill, wherein she attests that Mr. Feighery received a medical screening examination in accordance with the screening procedures in place for patients presenting like symptoms. *See* Affidavit Of Karen F. O'Neill, M.D., Defendant's Statement of Material Facts, Exhibit G. It is Dr. DiCapua's practice to determine whether a patient presenting syncope has a cardiac problem by determining whether the patient has chest pain or a history of myocardial infarction, conducting a 12–lead EKG, and to place the emergent patient on a heart monitor. *See* DiCapua Deposition at 63–64, 114. Dr. DiCapua testifies that a paper strip from the heart monitor measuring the patient's ST elevations is typically run when a patient first comes into the emergency room, leaves to be transferred, or if the patient has any particular complaints. *See* DiCapua Deposition at 114. The heart monitor is observed by the nurses at the nurse station, the bedside nurse, and the attending physician. *See* DiCapau Deposition at 120–21; O'Neill Deposition at 45–46. Dr. DiCapua and Dr. O'Neill also maintain that if the patient's symptoms present signs of a cardiac problem, it is their practice to take a full history of the patient including specific cardio risk factors. *See* DiCapua Deposition at 36; O'Neill Deposition at 97–98.

In this case, an emergency room nurse and physician interviewed Mr. Feighery about his symptoms including whether he had any history of cardiac problems. *See* ER Record; Desveaux Deposition at 28; DiCapua Deposition at 21–22. Mr. Feighery reported that he had suffered a four-minute long syncopal episode approximately four hours after eating clams and was weak with nausea and vomiting. *See* ER Record; DiCapua Deposition at 21–22. Dr. DiCapua took Mr. Feighery's vital signs and noted in the ER Record that Mr. Feighery was awake, alert, and verbal, that he had a normal sinus rhythm, a regular heartbeat, clear lungs, no guarding, rebound, or rigidity, no clubbing, cyanosis, or edema in his extremities, and that his abdomen was unremarkable. *See id.* There is no indication that Mr. Feighery complained of chest pain to York Hospital medical personnel. *See Supra,* footnote 4; ER Record; DiCapua Deposition at 22–23, 25; Desveaux Deposition at 66–67, 82. Dr. DiCapua also administered an EKG, a CK enzyme test, and placed Mr. Feighery on a heart monitor. *See* ER Record; Desveaux Deposition at 55–56, 61–63; DiCapua Deposition at 61–68, 74. The cardiogram was normal, and the CK enzyme test indicated that Mr. Feighery had not suffered a myocardial infarction. *See id.* After screening Mr. Feighery, Dr. DiCapua determined that Mr. Feighery had an emergency medical condition and admitted him to the hospital. Mr. Feighery was diagnosed with intractable vomiting due to ingestion of clams and a secondary diagnosis of syncope. *See* ER Record; O'Neill Deposition at 19–21, 27–28. Dr. DiCapua told Dr. O'Neill, when she took over Mr. Feighery's care, that he had ruled out a cardiac problem. *See* O'Neill Deposition at 100–01; DiCapua Deposition at 26–27, 60–62.

■ Plaintiff identifies four specific departures from York Hospital's standard emergency room screening procedures: (1) that the nurse and physicians tending to Mr. Feighery did not inquire of Mr. Feighery whether any cardiac risk factors applied in his case; (2) that the nurse and physicians failed to provide Mr. Feighery with oxygen,[10] to conduct "neuro checks," and to weigh him, as required by the Protocols; (3) that the nurse and physicians failed to properly observe the results of the cardiac monitoring including the ST segment deviation that occurred at 6:57 p.m.; and (4) that Dr. O'Neill failed to take an additional history and do her own neurological examination when she took over Mr. Feighery's care. The Court concludes that Plaintiff has not presented sufficient evidence that York Hospital departed from the essential elements of the screening examination in place for patients presenting Mr. Feighery's symptoms.

■ The Court will first address departures one, three, and four. Even assuming that York Hospital failed to take a cardiac risk factor history of Mr. Feighery, failed to properly observe the results of the cardiac monitoring, including the ST segment deviation that occurred at 6:57 p.m., and that Dr. O'Neill failed to take an additional history and do her own neurological examination when she took over Mr. Feighery's care are true, Plaintiff's argument that this evidence is sufficient to support a claim under the EMTALA fails as a matter of law. There is simply no evidence in the record that York Hospital requires medical personnel to screen a patient who presents himself or herself at the emergency room with syncope in this manner. The Protocols do not mention taking a cardiac risk factor history, observing the heart monitor

in a particular fashion, or reinterviewing or conducting a second set of neurological tests when a second physician takes over the care of a patient. *See* Protocols. The only evidence in the record regarding these particular procedures is the testimony of Dr. DiCapua and Dr. O'Neill indicating that they take an in-depth cardiac risk factor history *when they perceive that a patient is suffering from a cardiac-related problem,* see DiCapua Deposition at 36; O'Neill Deposition at 97–98, which the summary judgment record indicates they did not. In addition, Dr. DiCapua testified that a paper strip is run from the heart monitor when the patient is admitted, transferred or has a cardiac-related complaint. DiCapua Deposition at 114. Plaintiff presents testimony of experts who claim that an appropriate medical screening for an emergent cardiac/syncopal patient includes the close observation of the results of cardiac monitoring, additional EKGs, reinterviewing a patient when care is transferred, and providing additional neurological examinations. *See* Deposition of Pamela Bensen, M.D. at 54–55, 94–97; Report of Paul Minton, M.D. at 2; Deposition of Phelps Carter at 89–91. Evidence of what York Hospital's screening procedures for patients presenting syncope should be, while relevant to a malpractice claim, is not relevant to Plaintiff's claim under the EMTALA. As discussed, the EMTALA does not require hospital's screening procedures to meet a national standard of care. Under the EMTALA, a hospital is simply required to provide the same screening to patients presenting the same symptoms.

Here, Mr. Feighery presented symptoms that included syncope and Dr. DiCa-

---

**10.** The Court finds that the fact that York Hospital did not provide Mr. Feighery with oxygen while in the emergency room is not material to Plaintiff's claim that her husband was not adequately screened. The crux of a section 1395dd(a) claim is to determine whether a hospital provided "an appropriate medical screening examination" that will "determine whether or not an emergency medi-

cal condition" exists. *See* 42 U.S.C. § 1395dd(a). The administration of oxygen is not a screening method used to determine whether a patient suffers from a particular emergency condition; the administration of oxygen is used to stabilize or treat a patient. Thus, the Court will disregard this fact for purposes of the EMTALA claim.

pua ruled out a cardiac problem. Therefore, the screening required was that mandated for syncope and no more.[11] Because Plaintiff has not met her burden on summary judgment to present evidence that York Hospital's standard protocol for patients presenting syncope includes these additional procedures, she cannot show that York Hospital departed from its own standards in Mr. Feighery's case when medical personnel did not take a cardiac risk factor history, did not properly observe the heart monitor, and Dr. O'Neill did not take an additional history and do her own neurological examination.

Plaintiff's argument ignores the distinction between the initial screening examination, the focus of the EMTALA, and the correctness of the treatment that follows from the screening. The EMTALA requires a screening examination to determine whether or not an emergency medical condition exists. *See* 42 U.S.C. § 1395dd(a). In this case, York Hospital was required to follow its standard screening procedures for patients exhibiting the same symptoms as Mr. Feighery—syncope. The EMTALA requires no less and no more. Perhaps if the physicians had performed the screening procedures that Plaintiff demands should have been conducted, Mr. Feighery would have been accurately diagnosed. Indeed, perhaps through inadvertence or inattention, Dr. DiCapua and Dr. O'Neill did not perceive Mr. Feighery to be presenting symptoms that would indicate a cardiac problem. The accuracy of the diagnosis and whether the physicians were negligent in arriving at it, however, is a question for state medical malpractice law, not the EMTALA; the Act simply does not impose any duty on a hospital requiring that the screening result in the correct diagnosis.

A case that supports the Court's conclusion that physicians are required to follow only the standard screening procedures required for the symptoms they perceive, rather than ones they arguably missed, is *Vickers v. Nash General Hospital, Inc.,* 78 F.3d at 141. In this case, a patient arrived at the emergency room after falling on his head. After examining him, the physician diagnosed him as suffering from lacerations of the scalp and repaired him with stitches. *See id.* An x-ray revealed no damage to the cervical spine. *See id.* Four days later the patient died. *See id.* He was found to have a broken skull, a tear in his cerebrum, and an epidural hematoma. *See id.* The plaintiff in *Vickers* argued that the patient received less than other patients presenting in this same medical condition received. The United States Court of Appeals for the Fourth Circuit held that no EMTALA claim was stated because "the allegation ultimately presented a conventional charge[ ] of misdiagnosis, and ... [its] reasoning would obliterate any distinction between claims of malpractice under state law and actions under EMTALA." *Vickers,* 78 F.3d at 143. That court reasoned that:

The flaw in [plaintiff's] reasoning is [the] failure to take the actual diagnosis as a given. EMTALA is implicated only when individuals who are *perceived* to have the same medical condition receive disparate treatment; it is not implicated whenever individuals who *turn out in fact* to have had the same condition receive disparate treatment. The Act would otherwise become indistinguishable from state malpractice law. As a result, when an exercise in medical judgment produces a given diagnosis, the decision to prescribe a treatment responding to the diagnosis cannot form

11. The record indicates that Plaintiff repeatedly told medical personnel that she believed that her husband was presenting symptoms of a heart attack and requested a cardiologist. Although, in hindsight, it is apparent that the physicians would have benefitted from listening to Plaintiff, as discussed below, the law under the EMTALA is clear that the physicians are required to screen according to the symptoms they perceive and not according to ones that they do not. The fact that Plaintiff perceived her husband to be suffering from a heart attach is not relevant to a claim under the EMTALA.

the basis of an EMTALA claim of inappropriate screening.

*Id.* at 144 (citation omitted) (emphasis added).

Here, as in *Vickers*, Plaintiff's argument that Mr. Feighery should have been asked about cardiac risk factors, that the physicians should have monitored his heart monitor more closely, and should have conducted further neurological testing, is ultimately a challenge to York Hospital's diagnosis, which was that Mr. Feighery was not suffering from a cardiac illness. The physicians responded to the symptoms they perceived—syncope—and the Court is concerned only with whether they followed those standard procedures that relate to that symptom. Their screening may not have been perfect and perhaps the Dependant's usual procedures fall below the national standard of care, but that is not evidence that Mr. Feighery was treated differently from any other patient perceived in the same manner as was he.

■■ Thus, the only departures from York Hospital's standard screening procedures that are relevant to Plaintiff's EMTALA claim are the facts that York Hospital did not weigh Mr. Feighery or conduct neuro tests, as the Protocols require. These are not sufficient enough deviations from the screening requirements set forth in the Protocols and by the physicians to sustain an inadequate screening claim under the EMTALA. The EMTALA's screening requirement "does not mean that any slight deviation by a hospital from its standard screening policy violates [the statute]. Mere *de minimus* variations from the hospital's standard procedures do not amount to a violation of hospital policy." *Repp*, 43 F.3d at 523. Here, the failure to weigh Mr. Feighery and to conduct neuro tests, especially when considered in light of the extensive screening provided Mr. Feighery by the nurse and physicians in this case, are mere *de minimus* deviations from the York Hospital's standard screening examination of a patient presenting syncope and do not amount to a violation of hospital policy. Therefore, York Hospital followed the essential elements of the screening procedures set forth in the Protocols and required for patients presenting syncope in this case.

■ Finally, Plaintiff alternatively argues that York Hospital had in place such woefully inadequate *ad hoc* screening procedures for emergency patients that they amounted to none. Plaintiff contends that York Hospital's screening procedures are so deficient as to constitute no adequate screening procedures. Congress's refusal to impose a national standard of care does not mean that a hospital can discharge its duty under the EMTALA by not providing any screening, or by providing screening at such a minimal level that it properly cannot be said that the screening is "appropriate." *See Correa*, 69 F.3d at 1192; *Eberhardt*, 62 F.3d at 1258; *Repp*, 43 F.3d at 522; *Baber*, 977 F.2d at 879 n. 7. The touchstone is whether the screening procedure is designed to identify an emergency medical condition that is manifested by severe symptoms. Plaintiff proffers testimony of experts who opine what an appropriate screening for a cardiac condition requires and how York Hospital's medical screening procedures are required. As stated above, the statutory language of the EMTALA clearly declines to impose on hospitals a national standard of care in screening patients. Thus, even if York Hospital's standards are below those commonly employed by the medical profession, that is not a concern under the EMTALA. To be equal to no screening whatsoever under the EMTALA, the screening examination must be almost nothing. Indeed, no court has found a screening so inadequate as to constitute no screening whatsoever under the EMTALA. Here, York Hospital interviewed Mr. Feighery about his symptoms, inquired into whether he was experiencing any chest pain, conducted an EKG and blood work, placed him on a heart monitor, and ultimately admitted him into the hospital.

The Court finds that the screening provided to Mr. Feighery in this case was not so woefully inadequate as to constitute no screening at all.

## IV. CONCLUSION

Accordingly, the Court concludes that there is no material fact issue as to whether York Hospital conducted an appropriate medical screening examination of Mr. Feighery. Hence, the Court **ORDERS** that York Hospital's motion for summary judgment on Counts VIII, IX, and X of Plaintiff's Amended Complaint be, and it hereby is, **GRANTED**.