Victor **TORRES OTERO,**
et al., Plaintiffs,

v.

**HOSPITAL GENERAL MENONITA,**
et al., Defendants.

**No. CIV. 99–1380 (JP).**

United States District Court,
D. Puerto Rico.

Sept. 28, 2000.

Gustavo A. Martinez Tristani, San Juan, PR, for Plaintiff.

Angel R. De Corral Julia, De Corral & De Mier, Humberto Vazquez Sandoval, Ri-

cardo A. Ramirez Lugo, San Juan, PR, for Defendant.

### OPINION AND ORDER

PIERAS, Senior District Judge.

## I. INTRODUCTION

The Court has before it co-Defendants Hospital General Menonita, Inc. and American International Insurance Company's Motion for Summary Judgment (docket No. 19) and Plaintiffs Víctor Torres Otero, Yolanda Martínez Rodríguez, and their minor son Víctor M. Torres Martínez's Opposition thereto (docket No. 24). Plaintiffs filed this action under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, alleging that Defendants Hospital General Menonita, Inc., American International Insurance Company, Dr. José Orellana Beltrán, Sindicato de Aseguradores Para La Suscripción Conjunta de Seguros de Responsabilidad Profesional Médico Hospitalaria ("SIMED"), and Emergency Critical Care Professional Corporation failed to adequately screen and stabilize co-Plaintiff Víctor Torres Otero ("Torres Otero") when he arrived at the emergency department of Hospital General Menonita on April 8, 1998 complaining of chest pain. They allege that due to the myocardial infarction suffered by Torres Otero on that day, he had to undergo heart surgery and is now totally disabled, and that this disability has caused him mental anguish. Plaintiffs also invoke the Court's supplemental jurisdiction to assert claims under Articles 1802 and 1803 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, §§ 5141, 5142. Defendants move the Court for the entry of summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, arguing that Plaintiffs have filed a garden-variety medical malpractice claim which is outside the scope of EMTALA, thus depriving this Court of original jurisdiction.

## II. STATEMENT OF UNCONTESTED FACTS

1. Hospital General Menonita ("the Hospital") is a participating hospital, within the scope of EMTALA, that operates an emergency department.

2. On April 8, 1998, at sometime between approximately 7:10 p.m. and 7:26 p.m., Torres Otero arrived at the Emergency Room of the Hospital with a chief complaint of chest discomfort, difficulty in breathing, and cramps in his left arm. He was under the influence of alcohol and smelled of alcohol.

3. The Hospital considers chest pain to be an emergency medical condition.

4. The Hospital only partially followed its chest pain protocol in the case of Torres Otero because he exhibited signs and symptoms of possible alcohol and/or drug intoxication.

5. On April 8, 1998, laboratory tests were performed on Torres Otero, including a CBC, an electrocardiogram, arterial blood gases, and a CPK (Creatine Phospokinace test). Torres Otero was administered one dose nitroglycerine sublingually, as well as other medications, including Zantac, Victaril, and Haldol.

6. On the same day, Torres Otero was admitted to the Hospital.

7. On April 9, 1998, at approximately 7:30 a.m. and 8:00 a.m., repeat electrocardiograms were performed on Torres Otero. The results are suggestive of a myocardial infarction.

8. At approximately 8:15 a.m., a consultation was requested with another physician, and laboratory tests were performed.

9. At 8:00 p.m., Torres Otero was transferred to the intensive care unit.

10. Torres Otero was administered Heparin to anticoagulate sometime after his admission to the intensive care unit on April 9, 1998.

11. Torres Otero remained in the Hospital under treatment for eight days.

12. On April 16, 1998, Torres Otero was transferred to the Cardiovascular Center in Río Piedras for heart surgery.

## III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 894 (1st Cir.1988). The function of summary judgment is "to pierce the boilerplate of the pleadings and examine the parties' proof to determine whether a trial is actually necessary." *Vega–Rodriguez v. Puerto Rico Tel. Co.,* 110 F.3d 174, 178 (1st Cir.1997) (citing *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1st Cir.1992)). It allows courts and litigants to avoid going to trial in cases where the plaintiff cannot prevail, thus conserving the parties' time and money and saving scarce judicial resources. *See McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995).

To defeat a motion for summary judgment, "the nonmoving party must demonstrate the existence of a trial-worthy issue as to some material fact." *Cortes Irizarry v. Corporacion Insular,* 111 F.3d 184, 187 (1st Cir.1997); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993). A fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989). A material issue is trial-worthy if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 24 (1st Cir.1989). The non-movant may not rest upon mere allegations or denials of the pleadings. *See* Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts.") It is with this standard in mind that the Court proceeds to assess the motion before it.

## IV. EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT ("EMTALA")

■ Congress passed EMTALA in 1986 as part of the Consolidated Omnibus Budget Reconciliation Act, to do away with the "dumping" of indigent and uninsured patients from private hospitals to public hospitals. *See Hardy v. New York City Health & Hosp. Corp.,* 164 F.3d 789, 792 (2d Cir.1999); *Brooks v. Maryland General Hospital, Inc.,* 996 F.2d 708, 710 (4th Cir.1993); *Malave Sastre v. Hospital Doctor's Center, Inc.,* 93 F.Supp.2d 105, 109 (D.Puerto Rico 2000) (Pieras, J.). Rather than a federal medical malpractice statute, EMTALA was a statutory response to reports that hospital emergency rooms were refusing to accept or treat patients arriving at their emergency departments who lacked medical insurance, as a result of the pressure to lower costs. *See Reynolds v. MaineGeneral Health,* 218 F.3d 78, 83 (1st Cir.2000); *Correa v. Hospital San Francisco,* 69 F.3d 1184, 1189–90, 1192 (1st Cir.1995). The scope of EMTALA, however, extends to all individuals who present themselves at a covered hospital, not just to the indigent and uninsured. *See Correa,* 69 F.3d at 1194; *Brooks,* 996 F.2d at 710–11.

■ EMTALA imposes three primary statutory duties upon all acute care hospitals that have executed Medicare provider agreements with the federal government pursuant to 42 U.S.C. § 1395cc. *See Pagan Pagan v. Hospital San Pablo, Inc.,* 97 F.Supp.2d 199, 202 (D.Puerto Rico 2000) (Pieras, J.) (citing *Lopez–Soto v. Hawayek,* 175 F.3d 170, 172 (1st Cir.1999)). First, a covered hospital must perform an appropriate screening of any individual who ar-

rives at its emergency room requesting treatment to determine whether he or she has an emergency medical condition. *See* 42 U.S.C. § 1395dd(a). Second, EMTALA imposes upon such hospitals the duty to stabilize any individual who presents an emergency medical condition, whether or not that individual arrived at the hospital's emergency room. *See id.,* § 1395dd(b); *Lopez–Soto,* 175 F.3d at 172. Finally, EMTALA provides that a hospital must comply with certain conditions in order to transfer a patient who has an emergency medical condition that has not been stabilized. *See* 42 U.S.C. § 1395dd(c); *Lopez–Soto,* 175 F.3d at 172.

▮ Here, Plaintiffs allege violations of sections 1395dd(a)-(b) of EMTALA, relating to the duty to screen and the duty to stabilize. The duty to appropriately screen is independent from the duty to stabilize; a cause of action may be brought for an alleged breach of one or both of these EMTALA provisions. *See Lopez–Soto,* 175 F.3d at 172–73 (rejecting a conjunctive reading of the duties set forth in EMTALA). To establish an EMTALA violation, a plaintiff, as a threshold matter, must show that the hospital is covered by EMTALA by virtue of having executed Medicare provider agreements with the federal government pursuant to 42 U.S.C. § 1395cc. *See* 42 U.S.C. § 1395dd(e)(2); *see also Lopez–Soto,* 175 F.3d at 172; *Correa,* 69 F.3d at 1189–90.

▮ The EMTALA duty to screen requires a covered hospital to perform, on any individual who come to the emergency department seeking examination or treatment, an "appropriate medical screening examination within the capability of the hospital's emergency department ... to determine whether or not an emergency medical condition [ ] exists." 42 U.S.C. § 1395dd(a); *see also Lopez–Soto,* 175 F.3d at 172–73; *Correa,* 69 F.3d at 1190. The screening obligation applies only to individuals who present themselves at a hospital's emergency department. *See Lopez–Soto,* 175 F.3d at 173; *see also Reynolds,* 218 F.3d at 82. By contrast, the duty

to stabilize is triggered when any individual "comes to a hospital and the hospital determines that the individual has an emergency medical condition ...." 42 U.S.C. § 1395dd(b)(1). EMTALA's stabilization provision requires that covered hospitals stabilize the patient before transferring or discharging him or her. *See id.; Correa,* 69 F.3d at 1190. Unlike the duty to screen, the duty to stabilize applies "regardless of how that person enters the institution or where within the walls he may be when the hospital identifies the problem," and is only triggered once an emergency condition is detected. *Lopez– Soto,* 175 F.3d at 173.

## A. Duty to Appropriately Screen

The parties do not contest that the Hospital is covered by EMTALA. Nor do they contest that co-Plaintiff Torres Otero arrived at the Hospital on April 8, 1998 seeking treatment at the Hospital's emergency room. The dispute in this case centers around whether the Hospital provided disparate treatment to co-Plaintiff Torres Otero, notwithstanding his complaints of chest pain and other symptoms suggestive of a myocardial infarction, in failing to provide an appropriate screening.

▮ The First Circuit has defined the duty to screen as the duty to provide an examination "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provide[ ] that level of screening uniformly to all those who present substantially similar complaints." *Correa,* 69 F.3d at 1192. An " 'appropriate' screening is properly determined not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures." *Malave–Sastre,* 93 F.Supp.2d at 109–10 (quoting *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1039 (D.C.Cir. 1991)). The plaintiff bears the burden of proving that in screening him or her, "the hospital failed to follow the screening policy or standard of care which it regularly follows for other patients presenting sub-

stantially similar conditions." *Id.* at 110 (citing *Power v. Arlington Hospital Ass'n,* 42 F.3d 851, 858 (4th Cir.1994)); *see also Marshall v. East Carroll,* 134 F.3d 319, 323–24 (5th Cir.1998).

 Defendants argue that because it is uncontested that the Hospital performed a number of tests on co-Plaintiff Torres Otero after he presented himself at the Hospital's emergency room, including a CBC, an electrocardiogram, and a CPK, Plaintiffs cannot maintain their cause of action for failure to appropriately screen. The Court disagrees with the Hospital's contention that the provision of some testing or treatment to a patient *a priori* satisfies a hospital's statutory obligation to appropriately screen. *See Romo v. Union Memorial Hosp., Inc.,* 878 F.Supp. 837, 842 (W.D.N.C.1995) (noting that "even if Defendant attended to [plaintiff] and treated him with a variety, or in his words 'a battery,' of tests and evaluations, it may still fall short of an 'appropriate medical screening'"). The crux of the inquiry is whether the Hospital followed its own standard screening procedures on this particular patient. *See Malave–Sastre,* 93 F.Supp.2d at 109–10. Plaintiffs have produced evidence that the Hospital only partially followed its protocol for patients reporting chest pain, because Torres Otero exhibited signs of alcohol or drug intoxication. (Plf's Exh. 3, pg. 2, # 11). The Hospital failed to explain why the fact of possible alcohol or drug intoxication caused it to depart from its screening policy for patients exhibiting chest pain. In light of the admission from the Hospital that it only partially followed its own protocol for chest pain, and in the absence of evidence that such departure was standard procedure, the Court finds that there is a genuine issue of material fact as to whether the Hospital failed to conduct an appropriate screening of co-Plaintiff Torres Otero when he presented himself at the Hospital's emergency room with chest pain on April 8, 1998. The Court now turns to the claim concerning the alleged failure to stabilize co-Plaintiff Torres Otero's medical condition.

**B. Duty to Stabilize**

 The duty to stabilize arises with respect to any individual who comes to a hospital after the hospital determines that the patient has an emergency medical condition. *See* 42 U.S.C. § 1395dd(b)(1); *Lopez–Soto,* 175 F.3d at 173. EMTALA defines an emergency medical condition as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual [ ] in serious jeopardy, or (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part ...." 42 U.S.C. § 1395dd(e)(1)(A). The burden is on the plaintiff to show that the hospital had actual knowledge that he or she was suffering from an emergency condition. *See Urban v. King,* 43 F.3d 523, 525 (10th Cir.1994).

 Once the hospital makes the determination that the patient is suffering from an emergency condition, the hospital must provide reasonable treatment to stabilize the patient's emergency situation before discharging or transferring him or her. *See* 42 U.S.C. § 1395dd(e)(3)(A). EMTALA defines the duty to stabilize as the duty "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility...." *Id.* As with screening, in determining whether a patient has been stabilized, the fact-finder must consider whether the medical treatment and subsequent release were reasonable in view of the circumstances that existed at the time the hospital discharged or transferred the individual. *See Delaney v. Cade,* 986 F.2d 387, 393 (10th Cir.1993). Liability under EMTALA does not hinge on the result of the plaintiff's condition after the release, but rather on whether the hospital would have considered another patient in the

same condition as too unstable to warrant his or her release or transfer. *See Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 269 (6th Cir.1990).

■ In the instant case, the parties do not contest that co-Plaintiff Torres Otero presented an emergency condition upon his arrival at the emergency room on April 8, 1998. The only disputed issue is whether the Hospital stabilized Torres Otero's condition before his April 16, 1998 transfer. Plaintiffs assert in their Opposition that Defendants' failure to reasonably treat Torres Otero's cardiac condition constitutes a failure to stabilize. (Plf's Opp. at 8–9.) This argument, however, reflects a fundamental misunderstanding of the duty to stabilize under EMTALA. The duty to stabilize is defined in the statute itself, and speaks of the requirement that a hospital provide treatment to assure that "no material deterioration of the condition is likely to result from or occur during the transfer." 42 U.S.C. § 1395dd(3)(A). In other words, the duty to stabilize exists not in a vacuum, but rather in reference to a transfer of the patient from the hospital. *See Gossling v. Hays Medical Center, Inc.,* Nos. 92–1488–PFK, 93–1302–PFK, 93–1492–PFK, 1995 WL 254269, *9 (D.Kan. Apr.21, 1995). A hospital violates its duty to stabilize under EMTALA when it fails to stabilize a patient before transferring or discharging him or her. *See Correa,* 69 F.3d at 1190. In this way, EMTALA seeks to fill in the gaps left by traditional state tort law: a mere failure to provide medical treatment consistent with generally accepted medical standards is actionable under state tort law, but an improvident transfer or discharge of a patient, particularly before treatment is initiated, risks leaving a patient without legal recourse. *See Brooks,* 996 F.2d at 710.

Plaintiffs do not even allege in their Second Amended Complaint that Torres Otero's treatment did not comply with EMTALA's stabilization standard as provided in section 1395dd(3)(A). Rather, Plaintiffs allege that the treatment provided was incorrect and/or delayed. (Second Amd. Compl. ¶ 25.) In their Opposition, Plaintiff state for the first time that Defendants' violated their statutory duty by failing to stabilize Torres Otero *before his transfer* on April 16, 1998. This statement, however, is made in entirely conclusory terms, without any supporting evidence whatsoever. The Court finds that Plaintiffs are attempting to engraft an EMTALA failure to stabilize claim upon a medical malpractice claim. EMTALA expressly defines the nature of the duty to stabilize in terms of the transfer or discharge of a patient; this Plaintiffs blithely ignore. Because Plaintiffs have come forward with no evidence to show the existence of a genuine issue of material fact as to whether the Hospital failed to stabilize Torres Otero before his transfer to the Cardiovascular Center at Río Piedras, the Court hereby DISMISSES this cause of action.

### C. Causation

■ Notwithstanding the Court's determination that a genuine dispute exists as to whether Torres Otero was appropriately screened by the Hospital on April 8, 1998, the Court finds that Plaintiffs' case contains a fatal flaw. Plaintiffs neglect to connect their alleged damages to the cause of action for failure to conduct an appropriate screening. The Court simply fails to see the relationship of cause and effect between the harm suffered by Torres Otero, which flows from the myocardial infarction suffered on April 8, 1998, and the claim relating to the Hospital's failure to screen.

The only evidence proffered as to causation is the expert report of Dr. Alfred R. Frankel. That report states that:

Víctor Otero–Torres sustained severe damage to his heart with an acute anteroseptal myocardial infarction as a direct result of the treating physician's

1. failure to do appropriate cardiac screening in the emergency department and serial cardiac enzymes;

2. failure to consult a cardiologist;

3. failure to give aspirin;

4. failure to anticoagulate with Heparin;

5. failure to use streptokinase or tissue plasmenogen activator (TPA) when it was obvious his patient was having an acute myocardial infarction;

6. failure to emergently transfer his patient to a hospital where appropriate cardiac treatment for myocardial infarction was available.

(Dft's Exh. II.) The report, however, neither cites to nor relies upon any technical evidence to provide a link in the causal chain between the Hospital's failure to appropriately screen Torres Otero and the alleged damages. It is uncontested that Torres Otero received additional testing and treatment for his heart condition at the Hospital during the eight days following his admission. The Hospital did not cause the myocardial infarction which damaged to Torres Otero's heart. At most Plaintiffs allege a failure to promptly treat the condition, without evidence to establish the nexus between the delay in proper diagnosis allegedly caused by the failure to appropriately screen and the need for heart surgery, the alleged total disability, and the emotional harm flowing therefrom, sufficient to create a trial-worthy issue of fact for the jury.

 The proffered expert evidence is fatally flawed in other respects. First, Plaintiffs have not submitted the curriculum vitae of Dr. Frankel or other evidence of his expertise in a relevant field of medicine, thus precluding this Court from determining that he is "qualified as an expert by knowledge, skill, experience, training, or education . . . ." Fed.R.Evid. 702. Second, when faced with a proffer of scientific evidence, the U.S. Supreme Court has directed that a district court determine "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993); *see also* Fed.R.Evid. 104(a). The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation." *Mitchell v. Gencorp. Inc.*, 165 F.3d 778, 780 (10th Cir.1999). Dr. Frankel does not disclose his underlying reasoning or methodology in his report, which deprives this Court of a basis for evaluating whether that reasoning or methodology is scientifically valid and properly applied to the facts of this case. As such, Dr. Frankel's expert opinion is inadmissible on the issue of causation. *See Schubert v. Nissan Motor Corp. in U.S.A.*, 148 F.3d 25, 29 (1st Cir.1998) (quoting *Casas Office Machines, Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 681 (1st Cir.1994)) ("Under Rule 56(e), affidavits supporting or opposing summary judgment must set forth facts that would be admissible in evidence. A district court may exclude expert testimony where it finds that the testimony has no foundation or rests on . . . speculative evidence."); *see also In re Independent Service Org. Antitrust Litig.*, 85 F.Supp.2d 1130, 1163 (D.Kan.2000) (excluding expert opinion where expert failed to submit curriculum vitae and did not properly demonstrate scientific validity of his methodology). In view thereof, the record is devoid of admissible evidence to create a genuine issue of fact concerning causation.

The Court reminds Plaintiffs that on summary judgment, it is the plaintiff's duty to present evidence to sustain its cause of action. *See Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 94 (1st Cir.1996) ("In order to survive the swing of the summary judgment axe, the nonmoving party must produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted.") (internal citations omitted). Because the evidence submitted by Plaintiffs could

not support a verdict in their favor, the entry of summary judgment in favor of Defendants is appropriate.

## V. CONCLUSION

For the foregoing reasons, the Court hereby GRANTS co-Defendants' Hospital General Menonita, Inc. and American International Insurance Company's Motion for Summary Judgment. Having dismissed Plaintiffs' claims under EMTALA, the Court declines to exercise supplemental jurisdiction over the Puerto Rico law claims. Because the only claims that may be brought against co-Defendants Dr. José Orellana Beltrán and SIMED are those arising under Puerto Rico law,[1] the Complaint is hereby DISMISSED against these co-Defendants.

**IT IS SO ORDERED.**

---

**1.** No cause of action is available under EMTALA against individual physicians. *See Eberhardt v. City of Los Angeles,* 62 F.3d 1253 (9th Cir.1995); *King v. Ahrens,* 16 F.3d 265 (8th Cir.1994); *Delaney v. Cade,* 986 F.2d 387 (10th Cir.1993); *Lebron v. Ashford Presbyterian Community Hosp.,* 995 F.Supp. 241, 243–44 (D. Puerto Rico 1998).