Milisa **LOPEZ MORALES** et als., Plaintiff(s),

v.

**HOSPITAL HERMANOS MELENDEZ** et als., Defendant(s).

**No. Civil No. 01–2237(JAG).**

United States District Court, D. Puerto Rico.

Jan. 31, 2003.

David Efron, Rio Piedras, PR, for Plaintiffs.

Raphael Pena–Ramon, De Corral & De Mier, San Juan, PR, for Defendants and Third–Party Plaintiff.

Jose A. Gonzalez–Villamil, San Juan, PR, Ramonita Dieppa–Gonzalez, Miranda Cardenas & Cordova, San Juan, PR, for Third–Party Defendants.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

Pending before the Court is defendants Hospital Hermanos Meléndez (HHMI) and American International Insurance Company's (AIICO), motion for summary judgment (Docket Nos. 20 and 27). Defendants claim that they are not liable to plaintiffs under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. §§ 1395dd et seq., because they strictly complied with the stabilization requirements mandated by the Act. Plaintiffs opposed, alleging that defendants failed to stabilize their newborn before transferring him to another hospital (Docket No. 36). In turn, defendants filed a reply alleging they transferred the newborn appropriately (Docket No.42).

## I. FACTUAL BACKGROUND

On September 19, 2000, at approximately 9:00p.m., plaintiff Milisa López Morales ("López") began to have labor pains. Her husband, plaintiff Omar Antonio Matos Rivera ("Matos"), took Mrs. López to HHMI where she was admitted at approximately 2:00 a.m. on September 20, 2000. The doctors performed a cesarean section delivery on López and at 12:16 p.m., Jomar Antonio Matos López (baby Jomar) was born. López gave birth without any notable complications and a healthy Baby Jomar weighed nine pounds six ounces and measured nineteen and one-half inches. The hospital staff placed baby Jomar in the nursery at approximately 12:30 p.m. that night and the progress notes for that night and the next day indicate that he tolerated his diet well. The next day, López nursed baby Jomar and several relatives saw baby Jomar in good condition through the nursery window.

On or about 11:55 p.m., on September 21, Baby Jomar developed an emergency medical condition. A nurse found him lying sideways on his bassinet with a grayish, mottled color. The nurse notified the doctors, who immediately transferred baby Jomar to the neonatal intensive care unit (NICU) and began resuscitation measures. The doctors intubated Baby Jomar and found milk in his trachea. X-rays then revealed that they had placed the tube too low in the baby's trachea. Accordingly, the doctors repositioned the tube. The records reveal that baby Jomar did not tolerate well the tracheal tube so the same was removed and the doctors intubated him through the nose. Epinephrine was administered to combat the baby's low heart rate. The doctors then placed baby Jomar on heart, respiratory and oxygen saturation monitors which revealed an increased heart rate and normal oxygenation. They began running IV fluids and at 12:15 a.m., they placed baby Jomar in a respirator. The nurses administered antibiotics, Decadron and Sodium Bicarbonate. At 2:00 a.m., the doctors replaced baby Jomar's nose tube with an oxygen hood. Laboratory results revealed severe metabolic acidosis so the doctors administered medication. Follow-up laboratory results demonstrated that the acidosis was corrected and that the baby was well-oxygenated. When baby Jomar developed twitching movements, the doctors administered Phenobarbital Sodium. It was at 3:05 a.m., after notifying plaintiffs of the need to transfer baby Jomar, that the doctors began to make the transfer arrangements. Before the transfer, X-rays were repeated.

At 4:00 a.m., the HHMI doctors accompanied baby Jomar as he was transferred to the San Juan Bautista Medical Center in Caguas, Puerto Rico. Throughout the

transfer, the baby remained in the oxygen hood and his vital signs were well within the normal limits. The records do not indicate whether there was any deterioration in Baby Jomar's medical condition once he was admitted at San Juan Bautista Medical Center, but plaintiffs suggest that Baby Jomar's present state and quality of life are a direct result of HHMI's alleged failure to stabilize him prior to the transfer. They allege that as a result of HHMI's failure to stabilize Baby Jomar's emergency condition prior to his transfer, he suffered brain damage and has respiratory difficulties of an incapacitating nature. Subsequently, baby Jomar has had to undergo a gastronomy and tracheotomy, thereby reducing his quality of life and his chances of long term survival. Plaintiffs filed this action on September 18, 2001.

## II. DISCUSSION

### A. Standard for Summary Judgment

The standard for summary judgment is governed by Fed. R.Civ. P. 56. The court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ. P. 56(c); *see Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46,.52 (1st Cir.2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A contested fact is "material" when it has the potential to change the outcome of the case. *Vega–Rodriguez v. Puerto Rico Tel. Co.,* 110 F.3d 174, 178 (1st Cir.1997). An issue is genuine if a reasonable jury could resolve the dispute for the nonmoving party.

*Cortés–Irizarry v. Corporación Insular,* 111 F.3d 184, 187 (1st Cir.1997); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to defeat a motion for summary judgment, the party opposing the motion must "present definite, competent evidence to rebut the motion." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994). The non-moving party must show that a trial-worthy issue exists and must point to specific facts that demonstrate the existence of an authentic dispute. *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991). "The mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Furthermore, the Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). "If, after this canvassing of the material presented, the district court finds that some genuine factual issue remains in the case, whose resolution one way or another could affect its outcome, the court must deny the motion." *Lipsett,* 864 F.2d at 895.

### B. Hospital Hermanos Melendez's Summary Judgment Motion

In their motion for summary judgment, defendants allege that Baby Jomar was properly stabilized prior to his transfer and that therefore, no EMTALA provisions were violated. Accordingly, they urge the Court to dismiss the case for lack of federal jurisdiction. Because they argue the Court does not have original jurisdiction over the action, defendants also urge the court to decline to hear the supplemental state law claims.

In their opposition to defendants' motion for summary judgment, plaintiffs allege that HHMI failed to comply with its statutory duty to stabilize Baby Jomar prior to his transfer. Furthermore, they argue that HHMI did not complete the necessary documentation to effectuate an appropriate transfer of an unstable patient. They contend that HHMI's failure to stabilize baby Jomar's condition has left him with severe brain damage, respiratory difficulties and the need to undergo a gastronomy and tracheotomy so he can be artificially fed and respirated.

## C. EMTALA

EMTALA was enacted in 1986 as a congressional response to the concern that uninsured, underinsured and indigent patients were being "dumped" onto other hospitals by hospitals who did not want to treat hem. See Feighery v. York Hospital, 59 F.Supp.2d 96, 101–102 (citing Summers v. Baptist Medical Center Arkadelphia, 91 F.3d 1132, 1136 (8th Cir.1996)). The Act intended to create a new cause of action, separate from traditional state medical malpractice. Courts have routinely explained that EMTALA is not to be treated as a federal malpractice statute. See Feighery 59 F.Supp.2d at 102; Fuentes Ortiz v. Mennonite General Hospital, 106 F.Supp.2d 327, 330 (D.P.R.2000).

EMTALA has two key provisions: (1) hospitals must provide appropriate screening to emergency room patients and (2) they must provide the services necessary to stabilize the patient's condition before release or transfer. See Alvarez–Pumarejo v. Municipality of San Juan, 972 F.Supp. 86, 87 (D.P.R.1997) (citing Correa v. Hosp. San Francisco, 69 F.3d 1184, 1190 (1st Cir.1995)). In addition, the Act provides that a hospital must comply with certain conditions in order to transfer a patient who has an emergency condition that has not been stabilized. See 42 U.S.C. § 1395dd(c); Torres Otero v. Hospital General Menonita, 115 F.Supp.2d 253, 258 (D.P.R.2000). The Act does not require a hospital to provide a uniform or minimal level of care to every patient seeking emergency care and does not provide a cause of action for misdiagnosis or improper medical treatment. Feighery, 59 F.Supp.2d at 102 (citing Marshall v. East Carroll Parish Hosp., 134 F.3d 319, 322 (5th Cir.1998)). These areas are traditionally left to state malpractice laws. The purpose of EMTALA is to bridge the gap not covered by state malpractice laws and to ensure that there be "some screening procedure, and that it be administered even-handedly." Correa, 69 F.3d at 1192. "A mere failure to provide medical treatment consistent with generally accepted medical standards is actionable under state tort law, but an improvident transfer or discharge of a patient, particularly before treatment is initiated, risks leaving a patient without legal recourse." Torres Otero, 115 F.Supp.2d at 260; see also Brooks v. Maryland General Hospital, Inc., 996 F.2d 708, 710 (4th Cir.1993).

Plaintiff's EMTALA claim hinges on HHMI's alleged failure to comply with the statute's stabilization requirements. See 42 U.S.C.A. § 1395dd (b). HHMI does not dispute the first two prongs of the EMTALA inquiry but contends that it properly stabilized baby Jomar before it transferred him. The stabilization duty "guarantees patients the right, if an emergency condition is determined to exist, to have that condition stabilized before discharge or transfer to another hospital." Reynolds v. MaineGeneral Health, 218 F.3d 78, 84 (1st Cir.2000). It is only triggered once an emergency medical condition is determined to exist. Torres Otero v. Hospital General Menonita, 115 F.Supp.2d 253, 258 (D.P.R.2000); see also

*Vickers v. Nash Gen. Hosp., Inc.,* 78 F.3d 139, 145 (4th Cir.1996)(explaining that "the Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware"). Unlike the duty to screen, the duty to stabilize applies regardless of how the person entered the hospital or where within the walls of the institutions he may be. EMTALA defines the duty to stabilize as one to provide "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the conditions is likely to result from or occur during the transfer of the individual from a facility." *See* 42 U.S.C. § 1395 dd(e)(3)(A). To determine whether a patient has been stabilized, the Court must consider "whether the medical treatment and subsequent release were reasonable in view of the circumstances that existed at the time the hospital discharged or transferred the individual." *Torres Otero,* 115 F.Supp.2d at 259. Liability under EMTALA is not determined based on the patient's condition after the release, but rather on whether the patient received the medical attention that any other patient in his position would have received. *Id.* at 259 (*citing Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 269 (6th Cir.1990)).

■ The Court finds that plaintiffs have not adduced contested material facts to defeat defendant's motion for summary judgment. In response to defendants' statement of uncontested material facts, plaintiffs only adduce the testimony of Dr. Allan Hausknecht, who identifies three ways in which he believes HHMI failed to stabilize baby Jomar. First, Dr. Hausknecht opines that HHMI allegedly failed to clear Baby Jomar's airway prior to intubation despite clear evidence that he had aspirated a feeding. Second, the expert

witness states that the failure to correctly position the endotracheal and nasogastric tubes and the consequent need to remove the tubes and reposition them on three separate occasions deprived the baby of oxygen and caused the baby's condition to deteriorate. Third, Dr. Hausknecht points to the fact that Baby Jomar's initial mild cyanosis deteriorated into severe hypoxia and respiratory depression.

■ These allegations are not contentions of fact but arguments as to the quality and properness of the treatment that the medical staff at HHMI provided to baby Jomar. First, plaintiffs do not point to any evidence, before baby Jomar's first intubation, that would have put the HHMI doctors on notice that the baby had aspirated a feeding and that this was the cause of his emergency medical condition. Second, the failure to correctly position the endotracheal and nasogastric tubes which caused baby Jomar to be reintubated three times is not a colorable claim under EMTALA. *See Fuentes Ortiz,* 106 F.Supp.2d at 332 ("Patients are entitled under EMTALA, not to correct or non-negligent treatment in all circumstances, but to be treated as other similarly situated patients.") While the doctors at HHMI could have been negligent in their monitoring, intubation, or diagnosis of Baby Jomar, they followed standard procedure and successfully achieved his stabilization, if not recuperation. *See generally Torres Nieves,* 998 F.Supp. 127. Third, the caselaw makes clear that the worsening of an emergency medical condition prior to transfer is insufficient to state a claim for failure to stabilize under EMTALA. *Torres Otero,* 115 F.Supp.2d at 259 ("Liability under EMTALA does not hinge on the result of the plaintiff's condition after the release.") The inquiry concerns the patient's condition at the time of transfer, not the eventual outcome of the condition or

even the prospects for the patient's recovery. *Id.*

The Court finds that plaintiffs are attempting to engraft an EMTALA claim upon a traditional state malpractice claim. The duty to stabilize did not require that Baby Jomar be in perfect health prior to his discharge or transfer, nor did it require that the treatment provided to Baby Jomar be perfect. The only duty that EMTALA imposed was that it treat Baby Jomar at it would any other patient who exhibited his emergency medical condition. Whether the doctors at HHMI made mistakes in intubating Jomar or in detecting his condition in the first place, these mistakes do not give rise to a federal cause of action under EMTALA, even if they were the direct result of baby Jomar's current afflictions. *Torres Nieves v. Hospital Metropolitano,* 998 F.Supp. 127, 133 (D.P.R. 1998) (EMTALA's duty to stabilize does not "impose a duty to fully cure an emergency condition before transferring or discharging the patient").

█ Because the Court finds that baby Jomar was stabilized as required by EMTALA, HHMI was not required to obtain any transfer certificates in order to transfer baby Jomar to another hospital. The statute makes clear that certain transfer certificates and other documentation are required when hospitals seek to transfer a patient that has not been stabilized. *See* 42 U.S.C. § 1395 dd (c)(1). This additional documentation is not necessary if a patient is stabilized prior to the transfer. *See Lopez–Soto v. Hawayek,* 175 F.3d 170, 176 (1st Cir.1999).

## III. CONCLUSION

For the reasons set forth above, the Court GRANTS co-defendants' motion for summary judgment. Accordingly, the Court dismisses the EMTALA claim with prejudice and the state law claims without prejudice. Judgment shall enter accordingly.

IT IS SO ORDERED.