ESTATE OF FELIX GIOMARD RIVERA, et al., Plaintiffs,

v.

DOCTOR SUSONI HOSPITAL, INC., et al., Defendants.

No. CIV. 02–1407(PG).

United States District Court, D. Puerto Rico.

Oct. 7, 2003.

Ricardo Ruiz–Diaz, Ruiz & Reyes Law Offices, Fajardo, PR, for plaintiffs.

Teresa M. Garcia–Moll, San Juan, PR, for defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

Before the Court is Co–Defendant Doctor Susoni Hospital's Motion for Summary Judgment, (Def.'s Mot. Summ. J., Docket No. 14), and Plaintiffs' Opposition to Co–Defendant's Motion for Summary Judgment, (Pls.' Opp'n Mot. Summ. J., Docket No. 26). For the reasons set forth below, Co–Defendant's Motion for Summary Judgment is **GRANTED.**

## BACKGROUND

On March 25, 2000, around 11:45 P.M., Felix Giomard Rivera Rodríguez was involved in an automobile accident causing him severe injuries. (Am. Compl. ¶ 8, Docket No. 20). Rivera–Rodríguez was taken to the emergency room in Doctor Susoni Hospital, Inc., in Arecibo, Puerto Rico, at around 1:15 A.M. (Am.Compl.¶ 9). Rivera died later that morning. (Pls.' Opp'n Mot. Summ. J., Ex. 1). Plaintiffs, comprising the estate of Rivera–Rodríguez, claim that Rivera–Rodríguez's death was the direct result of the Co–Defendants' negligence and failure to screen, stabilize, and treat him during his stay in the emergency room. (Am.Compl.¶¶ 11–14). Plaintiffs specifically claim that Rivera–Rodríguez was neither timely nor properly triaged, (Am.Compl.¶ 11); was the victim of disparate treatment and untimely medical care, (Am.Compl.¶ 13); and his condition was allowed to irreversibly worsen, (Am.Compl.¶ 13).

Plaintiffs filed suit against Doctor Susoni Hospital, Inc. and Saint Paul Fire & Marine Insurance Co. (Am.Compl.). Plaintiffs claim that Co–Defendant Doctor Susoni Hospital violated the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §§ 1395dd, by failing to adequately screen and stabilize Rivera–Rodríguez. (Am.Compl.¶¶ 16–18). Plaintiffs also brought a negligence claim under Puerto Rico law against Co–Defendant Doctor Susoni Hospital, claiming that its negligent actions and omissions caused Rivera–Rodríguez's death. (Am.Compl. §§ 19–21).

## SUMMARY JUDGMENT STANDARD

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue is one that is dispositive and must be resolved at trial because a reasonable jury could resolve in favor of the non-moving party. *Arvelo v. American International Insurance Co.,* 875 F.Supp. 95, 99 (D.P.R.1995). Moreover, a fact is material if under applicable substantive law it may affect the result of the case. *See Ortega–Rosario v. Alvarado–Ortiz,* 917 F.2d 71, 73 (1st Cir. 1990).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Once a moving party has made a showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to demonstrate that a trial worthy issue remains. *See Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997); *Borschow Hosp. & Med. Supplies Inc., v. Cesar Castillo, Inc.,* 96 F.3d 10,14 (1st Cir.1996). The non-moving party must set forth specific facts in proper evidentiary form substantiating that a genuine factual issue exists for trial. Nevertheless, in determining whether summary judgment is warranted, the court views the facts alleged in the light most favorable to the non-moving party and must indulge all inferences in favor of that party. *Rossy v. Roche Products, Inc.,* 880 F.2d 621, 624 (1st Cir.1989).

## DISCUSSION

Concerned with "the increasing number of reports that hospital emergency rooms [were] refusing to accept or treat patients with emergency conditions if the patient [did] not have medical insurance," H.R.Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), reprinted in U.S.C.C.A.N. 42, 605, Congress enacted EMTALA to "assure that any person visiting a covered hospital's emergency room is screened for an emergency medical condition and is stabilized if such a condition exists," *Guadalupe v. Hosp. Interamericano,* 299 F.3d 15, 19 (1st Cir.2002). EMTALA imposes two basic obligations on participating hospitals: (1) screening individuals who present themselves at the emergency department and (2) stabilizing victims of a detected medical emergency. *See* 42 U.S.C. § 1395dd(a); *see also López–Soto v. Hawayek,* 175 F.3d 170, 173 (1st Cir.1999). Courts have emphasized that EMTALA is not a malpractice statute, but an "anti-dumping" statute; it did not create a general federal cause of action for medical practice in emergency rooms. *See Reynolds v. MaineGeneral Health,* 218 F.3d 78, 83 (1st Cir.2000); *Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1192 (1st Cir. 1995).

### 1. *Duty to Screen*

EMTALA requires participating hospitals to provide to anyone who "comes to the emergency department" and requests examination or treatment "an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department," to determine whether or not an

emergency medical condition exists. 42 U.S.C. § 1395dd(a). Although the statute fails to define "appropriate medical screening examination", it is firmly established that the essence of EMTALA's screening requirement "is that there be some screening procedure, and that it be administered even-handedly." *Correa,* 69 F.3d at 1192. Hospitals fulfill this duty to screen patients in their emergency departments if they provide "for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provide that level of screening uniformly to all those who present substantially similar complaints." *Id.* To recover for disparate treatment, the plaintiff must proffer evidence "sufficient to support a finding that [he or she] received materially different screening than that provided to others in his [or her] condition. It is not enough to proffer expert testimony as to what treatment should have been provided to a patient in [Plaintiff's] position." *Reynolds,* 218 F.3d at 84.

■ Although Plaintiffs' complaint alleged that Co–Defendant had failed to screen Rivera–Rodríguez in violation of EMTALA, Plaintiffs' now claim that "screening is of no concern" because Co–Defendant had "promptly triaged" the deceased and had determined that he had a emergency medical condition. (Pls.' Opp'n Mot. Summ. J. ¶ 11). With this admittance that Rivera–Rodríguez was properly screened, there is no issue of material fact regarding Co–Defendant's screening duties under EMTALA. Dismissal would be appropriate, however, even if Plaintiffs had not changed their tune. The evidence submitted by the Plaintiffs does not support a finding that the deceased received materially different screening than that provided to others in his condition, or that the screening examination was not reason-ably calculated to identify critical medical conditions that might have been affecting the deceased when he was examined in the emergency room. Plaintiffs' claims against Co–Defendant for failure to screen Rivera–Rodríguez in violation of EMTALA are thus **DISMISSED.**

### 2. *Duty to Stabilize*

Regarding the duty to stabilize, EMTALA provides as follows:

> If any individual … comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—
>
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b). Contrary to the duty to screen, the duty to stabilize applies "regardless of how that person enters the institution or where within the walls he may be" when the hospital determines that the patient is suffering an emergency condition. *López–Soto,* 175 F.3d at 173. An emergency medical condition is defined as

> a medical condition manifesting itself by acute symptoms of sufficient severity (including sever pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual … in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1).

■ "Once the hospital makes the determination that the patient is suffering

from an emergency condition, the hospital must provide reasonable treatment to stabilize the patient's emergency situation before discharging or transferring him or her." *Torres Otero v. Hosp. General Menonita,* 115 F.Supp.2d 253, 259 (D.P.R. 2000). The duty to stabilize is activated only if the hospital uncovers an emergency medical condition, *see López–Soto,* 175 F.3d at 172; *Marrero v. Hosp. Hermanos Meléndez, Inc.,* 253 F.Supp.2d 179, 198 (D.P.R.2003), and applies only in the context of patients who are discharged or transferred to another hospital, *see Harry v. Marchant,* 291 F.3d 767, 771 (11th Cir. 2002) ("The stabilization requirement only set forth standards for transferring a patient in either a stabilized or unstabilized condition. By its own terms, *the statute does not set forth guidelines for the care and treatment of patients who are not transferred.*") (emphasis added); *Bryan v. Rectors & Visitors of the Univ. of Virginia,* 95 F.3d 349, 352 (4th Cir.1996) ("The stabilization requirement is thus defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system"); *Correa,* 69 F.3d at 1190 ("To establish an EMTALA violation, a plaintiff must show that ... the hospital bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition."); *Marrero,* 253 F.Supp.2d at 198 (D.P.R.2003) ("A hospital violates its duty to stabilize under EMTALA when it fails to stabilize a patient before transferring or discharging him or her."); *Torres Otero,* 115 F.Supp.2d at 260 ("[T]he duty to stabilize exists not in a vacuum, but rather in reference to a transfer of the patient from the hospital."). This limitation to patients who are discharged or transferred to another hospital derives from the statutory definition of "to stabilize": to provide "such medical treat-

ment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur *during the transfer of the individual from a facility.*" 42 U.S.C. § 1395dd(e)(3)(A) (emphasis added).

When determining whether a patient has been stabilized, "the fact-finder must consider whether the medical treatment and subsequent release were reasonable in view of the circumstances that existed at the time the hospital discharged or transferred the individual." *Marrero,* 253 F.Supp.2d 179 (quoting *Torres Otero,* 115 F.Supp.2d at 259.). This analysis focuses not "on the result of the plaintiff's condition after the release, but rather on whether the hospital would have considered another patient in the same condition as too unstable to warrant his or her release or transfer." *Torres Otero,* 115 F.Supp.2d at 260–61; *accord Marrero,* 253 F.Supp.2d at 197. Under this standard of reasonable and uniform treatment, courts have confined both the breadth and duration of the duty to stabilize under EMTALA. *See, e.g., López–Soto,* 175 F.3d at 177 n. 4 (noting that imposing a duty to stabilize without duration limitations "might well encroach upon the province of state malpractice law.") (dicta); *Bryan,* 95 F.3d at 352 ("It seems evident to us that the stabilization requirement was intended to regulate the hospital's care of the patient in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake the treatment."); *Burditt,* 934 F.2d at 1370 n. 8 ("One may prove that a hospital has violated this standard by presenting evidence that something other than the present or projected medical needs of its patients de-

termined the treatment provided."); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271 (6th Cir.1990) ("[N]either the normal meaning of stabilization, nor any of the attendant legislative history or apparatus, indicates that Congress intended to provide a guarantee of the result of emergency room treatment and discharge."). These cases are consistent with the well-established view that the imposition of the duty to stabilize patients with emergency medical conditions neither transformed EMTALA into a federal malpractice statute nor incorporated the usual negligence standards of medical malpractice to determine EMTALA violations. *See, e.g., Marchant*, 291 F.3d at 774 ("By mandating treatment only in the context of a patient transfer, the stabilization requirement addresses Congress' concern regarding rejection of patients without converting EMTALA into a federal malpractice statute."); *Bryan*, 95 F.3d at 351 ("Once EMTALA has met the purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians. And the legal adequacy of that care is then governed not by EMTALA but by the state malpractice law.").

Here, Plaintiffs claim that during the stabilization phase "the process was incomprehensibly delayed, to the point of heightening [Rivera–Rodríguez's] deterioration." (Pls.' Opp'n Mot. Summ. J. ¶ 11). Plaintiffs point out, for instance, that contrary to the protocols of Doctor Susoni Hospital, Rivera–Rodríguez's vital signs were not taken until two hours after he arrived at the emergency room. (Pls.' Opp'n Mot. Summ. J. ¶ 12). They submitted evidence showing that Doctor Susoni Hospital also violated its own protocols when it failed to administer oxygen immediately upon determining that Rivera–Rodríguez was a poly-traumatized patient. (Pls.' Opp'n Mot. Summ. J. ¶ 13). Plaintiffs also noted that although a radiologist report revealed that Rivera–Rodríguez suffered an intra-abdominal hemorrhage, it was not until more than three hours later that Co–Defendant acted upon said diagnostic and operated the deceased. (Pls.' Opp'n Mot. Summ. J. ¶ 15). This evidence, Plaintiffs argue, suffices to show that Doctor Susoni Hospital did not comply with its obligation to stabilize patients with emergency medical conditions.

The first, and fatal, flaw with Plaintiffs' legal claims is that Rivera–Rodríguez was never discharged or transferred from the emergency room. Because the Hospital neither transferred or discharged Rivera–Rodríguez—and there is no evidence suggesting that it even intended or considered such an action—there can be no violation of the Hospital's duty under EMTALA to provide the treatment necessary to assure that no material deterioration would occur during the transfer of Rivera–Rodríguez.

Moreover, the arguments presented by the Plaintiffs are more akin to a malpractice suit than a violation of EMTALA's duty to stabilize. The evidence presented by the Plaintiffs does not support a finding that the medical treatment given to Rivera–Rodríguez was unreasonable in view of the circumstances, or unlikely to have prevented Rivera–Rodríguez's material deterioration. Neither is there any evidence to support a finding that something other than the projected needs of Rivera–Rodríguez at that time determined the treatment provided. Plaintiffs evidence may support a claim that the treatment was negligent or not sufficiently aggressive, but it does not support Plaintiffs' claim that Doctor Susoni Hospital violated EMTALA's duty to stabilize. Plaintiff's claims for violations of the duty to stabilize under EMTALA are thus **DISMISSED.**

### 3. *Supplement Jurisdiction Claims*

Having dismissed all federal claims against Defendants, the Court declines to exercise supplemental jurisdiction over Plaintiff's supplemental jurisdiction claims. *See Rivera v. Murphy,* 979 F.2d 259, 264 (1st Cir.1992) (quoting *Cullen v. Mattaliano,* 690 F.Supp. 93 (D.Mass.1988)) ("[I]t is the settled rule in this Circuit that in a non-diversity case, where pendent state claims are joined with a federal cause of action and that federal cause of action is the subject of a successful summary judgment motion, the pendent state claims should be dismissed.").

### *CONCLUSION*

For the reasons set forth above, Co-Defendant Doctor Susoni Hospital's Motion for Summary Judgment is **GRANTED.** The claims under EMTALA are **DISMISSED WITH PREJUDICE.** The claims for negligence under Puerto Rico law are **DISMISSED WITHOUT PREJUDICE.**

**SO ORDERED.**